IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT :
OPPORTUNITY COMMISSION, :
:
    Plaintiff, :
:
      v. :
:   C.A. No. 04-1304-KAJ
P.T. MORGAN PAPER COMPANY, an :
affiliate of P.T. MORGAN PACKAGING :
COMPANY, :
:
    Defendant. :

## DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

THE NEUBERGER FIRM, P.A.

THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Defendant

Dated: January 13, 2006

## TABLE OF CONTENTS

ARGUMENT..................................................................................................................1

I.    THE RELEVANT THIRD CIRCUIT LAW FOR AGGREGATION OF MULTIPLE
      COMPANIES IS SOLELY THE <u>NESBIT</u> TEST AND ITS APPLICATION SHOULD
      LEAD TO THE GRANT OF SUMMARY JUDGMENT FOR DEFENDANT.................1

      A.    Big Picture Items Which Are Not Actually In Dispute..........................................2

            1.    The Record Evidence Is That the Paper Company and the Packaging
                  Company Operate under Separate Management.......................................3

            2.    The Record Evidence Is That the Paper Company and the Packaging
                  Company Maintain Corporate Formalities................................................3

            3.    The Record Evidence Is That the Paper Company and the Packaging
                  Company Have Non-Integrated Human Resource Departments...............4

            4.    The Record Evidence Is That the Paper Company and the Packaging
                  Company Maintain Separate Payrolls and Finances................................4

            5.    The Record Evidence Is That the Paper Company and the Packaging
                  Company Do Not Deal with Third Parties As A Single Unit..................4

            6.    The Record Evidence Is That the Paper Company and the Packaging
                  Company Do Not Cover the Salaries of Each Other's Employees...........5

            7.    The Record Evidence Is That the Paper Company and the Packaging
                  Company are Not the Exclusive Source of Business with the Other........5

      B.    The Application Of The Four <u>Nesbit</u> Factors Also Results In The Grant of
            Summary Judgment.............................................................................................6

            1.    The Degree of Unity Between the Entities with Respect to
                  Ownership, Management, *and* Business Functions..................................6

                  (a)    The Degree of Unity Between the Entities with Respect to
                         Management.................................................................................6

                         (i)     Reimbursed Administrative Services Provided to the
                                 Paper Company...............................................................6

                         (ii)    James Morgan's Participation in the Paper Company
                                 in his Official Capacity...................................................7

                         (iii)   The Paper Company and the Packaging Company's
                                 Time and Attendance Policies.........................................8

                  (b)    The Degree of Unity Between the Entities with Respect to

Business Functions....................................................................9

    (i)    The Paper Company's Facsimile Communications........9

    (ii)   The Paper Company's Accounting and Corporate Address.........................................................................10

    (iii)  The Paper Company and the Packaging Company's Board of Directors Meetings.........................................11

    (iv)  Eugene Fox's Bonus from the Packaging Company.....12

2.     Whether the two Companies Present Themselves as a Single Company...................................................................................13

3.     Whether a Parent Company Covers the Salaries, Expenses, or Losses of its Subsidiary.........................................................14

4.     Whether One Entity does Business Exclusively with the Other.............16

II.    PLAINTIFF MISSTATES THE RECORD REGARDING ITS INVESTIGATOR.........17

III.   PLAINTIFF HAS FAILED TO FILE A SUFFICIENT RULE 56(f) AFFIDAVIT..........18

CONCLUSION..............................................................................................................19

## TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

Bradley v. U.S., 299 F.3d 197 (3d Cir. 2002)................................................................18-19

Miller v. Daimler Chrysler Corp., 219 F.R.D. 331 (D.Del. 2003)............................................18-19

Nesbit v. Gears Unlimited, Inc., 347 F.3d 72 (3d Cir. 2003)..................................................passim

**Statutes and Rules**

Title VII of the Civil Rights Act of 1964..................................................................................1, 2

Fed.R.Civ.P. 56(f)..................................................................................................................18-19

**Other Authorities**

Webster's Deluxe Edition Dictionary & Thesaurus (2001)............................................................14

## ARGUMENT

The issue is not complex and it is governed by just one very recent Third Circuit case. Indeed, plaintiff admits that standing alone the Paper Company does not employ the requisite number of employees to be held liable under Title VII. (D.I. 51, Plaintiff EEOC's Answering Brief in Opposition to Defendant's Motion for Summary Judgment and Brief in Support of its Cross-Motion for Summary Judgment [hereinafter "AB"] at 1-2).[1] However, the government attempts to shift the central focus away from the relevant law in Nesbit v. Gears Unlimited, Inc., 347 F.3d 72 (3d Cir. 2003), and instead marches the Court through a minutia of evidence in an effort to prove that the defendant should be aggregated with the Packaging Company. Yet, a closer look reveals that these are nothing more than red herrings.

**I.    THE RELEVANT THIRD CIRCUIT LAW FOR AGGREGATION OF MULTIPLE COMPANIES IS SOLELY THE NESBIT TEST AND ITS APPLICATION SHOULD LEAD TO THE GRANT OF SUMMARY JUDGMENT FOR DEFENDANT.**

Citation to district court decisions does not alter the fact that a simple reading of Nesbit reveals that its mode of analysis is binding and decisive to the pending motion. (D.I. 44, Plaintiff's Opening Brief ("OB") at 19-23). In Nesbit, the Third Circuit formulated a three part alternative test for determining when multiple companies should be aggregated for purposes of reaching the fifteen employee threshold under Title VII.[2] The only relevant inquiry before this Court is whether plaintiff can prove the defendant should be substantively consolidated with a legally, distinct company, the Packaging Company. Under the law of Nesbit, defendant submits

---

[1] In filing its Answering Brief, the EEOC simultaneously filed a joint Brief in Support of its Cross-Motion for Summary Judgment. (D.I. 51). Defendant waives any Answering Brief in this regard and relies upon the more than sufficient briefing on all issues found in its Opening and Reply briefs in support of its own motion.

[2] (1) Whether a company has split into two or more to evade Title VII, (2) whether a parent company directed their subsidiary's act, or (3) whether the two companies can be substantively consolidated. Nesbit, 347 F.3d at 86. Plaintiff concedes that it is unable to prove its case under the first and/or second prong. (AB 23-24).

they cannot.

Here the Third Circuit adopted an open-ended equitable inquiry to determine substantive consolidation. Nesbit, 347 F.3d at 87. The primary purpose is to determine if the companies' affairs are "so interconnected that they collectively caused the alleged discriminatory employment practice." Id. at 86. "More colloquially, the question is whether the 'eggs' - consisting of the ostensibly separate companies - are so scrambled that we decline to unscramble them." Id. The Court also noted that this remedy is equitable in nature and is "*difficult to achieve*." Id. (emphasis added).

The inquiry in a Title VII context focuses on the degree of "operational entanglement." Id. The relevant factors in determining this include: (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (*e.g.*, hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other. Id. The plaintiff must show that substantive consolidation would make sense under these factors. Id. at 88. But as the *relevant* evidence in the record shows, under these factors the Paper Company and the Packaging Company should not be substantively consolidated, and it defies common sense to do so. These companies are not scrambled together and are more than sufficiently distinct. Moreover, the plaintiff has failed in its opportunity to offer material evidence for each factor.

**A. Big Picture Items Which Are Not Actually In Dispute.** Before addressing the four prong operational entanglement test, it is helpful to note what is not challenged by the government. During discovery defendant produced abundant evidence proving the Paper Company is a legally distinct company which should not be substantively consolidated with the Packaging Company. This evidence is *extremely* relevant under Nesbit since it was the type of

2

evidence the Third Circuit commented on in concluding that two companies should not be substantively consolidated. Nesbit, 347 F.3d at 88-89. This included different management, maintaining corporate formalities, non-integrated human resource departments (meaning one company has a say in the hiring of its own employees), maintaining separate payrolls and finances, not dealing with third parties as a single unit, not covering the salaries of each other's employees, and not doing business exclusively with the other. But plaintiff seeks to substantively consolidate these two legally distinct companies without addressing this highly relevant evidence as to separateness which was produced for each category identified by the Third Circuit. All this evidence weighs in favor of defendant and on the unrebutted record indicates that there is no material fact dispute over it.

**1. The Record Evidence Is That the Paper Company and the Packaging Company Operate under Separate Management.** Defendant produced unrebutted evidence that Gary Eberhard, General Manager of the Paper Company, participates in its day-to-day operations, (Declaration of James B. Morgan Under 28 U.S.C. § 1746 ("Morgan") ¶29, A335), and James B. Morgan, President and Treasurer of the Packaging Company, participates in its day-to-day operations. (Morgan ¶28, A335). Thus, the Paper Company and the Packaging Company have different management.

**2. The Record Evidence Is That the Paper Company and the Packaging Company Maintain Corporate Formalities.** Defendant produced unrebutted evidence of separate Certificates of Incorporation and sample Directors' Minutes and Corporate Bylaws. (OB 3, 5, 6; A009, 028, 328, 329, 015; Morgan ¶¶8-10, A331-32). Defendant produced each Company's unrebutted separate tax returns for the years 2000 through 2005 which each Company filed in their respective States of incorporation. (OB 3, 5, 6; A044, 292, 117; Morgan ¶¶11-13, A332). Also, defendant produced unrebutted evidence that the two companies file separate unemployment insurance reports in their respective States. (OB 7; A267-70; Morgan

¶23, A334). Thus, the two companies maintain corporate formalities and operate separately.

**3. The Record Evidence Is That the Paper Company and the Packaging Company Have Non-Integrated Human Resource Departments.** Defendant produced unrebutted evidence that the Paper Company's General Manager, Gary Eberhard, is responsible for the hiring and firing of employees for the Paper Company. (OB 6; Morgan ¶16, A332; Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories, ¶2, 3, Exhibit J, PA18-20). Also, defendant produced evidence that James Morgan is responsible for the hiring and firing of employees for the Packaging Company. (OB 6; Morgan ¶16, A332-33; Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories, ¶2, 3, Exhibit J, PA18-20). Neither person nor Company participates in such personnel matters of the other. (OB 6-7; Morgan ¶16; A332-333).

**4. The Record Evidence Is That the Paper Company and the Packaging Company Maintain Separate Payrolls and Finances.** Defendant produced unrebutted evidence showing that both the Paper Company and the Packaging Company used Paychex, Inc. for their payroll processing, through two separate contracts. (OB 7; A252-66; Morgan ¶17, A333). Also, defendant produced unrebutted evidence that the two companies keep separate financial records and have separate bank accounts. (Morgan ¶20, A333-34). Thus, the companies keep separate payrolls and finances.

**5. The Record Evidence Is That the Paper Company and the Packaging Company Do Not Deal with Third Parties As A Single Unit.** Defendant produced unrebutted evidence of separately negotiated contracts with Paychex, Inc. (OB 7; A252-66; Morgan ¶17, A333). Also, defendant produced unrebutted evidence that the two Companies have separate health plans with different providers, (OB 7; A193-251; Morgan ¶18, A333), have separate policies for worker's compensation insurance, (OB 7; A165-76; Morgan ¶21, A334), and have

4

separate employee retirement plans with Morgan Stanley which are funded *separately*.[3] (OB 8; A177-92; Morgan ¶22, A334). Thus, third parties do not deal with them as a single unit.

**6. The Record Evidence Is That the Paper Company and the Packaging Company Do Not Cover the Salaries of Each Other's Employees.** In his declaration, James Morgan plainly and unequivocally stated that if an employee provides administrative services to the Paper Company, the Packaging Company is reimbursed for that employee's services. (Morgan ¶24, A334). This evidence is totally unchallenged. The Paper Company does not cut the employee a check as part of their salary, but in turn reimburses the Packaging Company for the use of its employee's services. (Id.). Thus, neither Company pays the salaries of the other Company's employees.

**7. The Record Evidence Is That the Paper Company and the Packaging Company are Not the Exclusive Source of Business with the Other.** Defendant produced unrebutted evidence that the Paper Company and the Packaging Company operate in distinctly different lines of production. (OB 8; Morgan ¶6, A331). The Paper Company makes bales of paper from paper trash and recycled fiber, ships them out and distributes some finished goods, (OB 8; Morgan ¶4, A330), and the Packaging Company is a broker-distributor of corrugated boxes. (OB 8; Morgan ¶5, A331). Also, each Company has its own customer list and vendors, (OB 8; Morgan ¶30, A335), and despite occasionally doing business with each other, neither Company is the *only* source of business for the other. (Id.). Defendant even listed the names of other businesses with which each Company does business. (OB 8; Morgan ¶¶31-32, A335). Thus, the Paper Company and the Packaging Company are not the exclusive sources of business for the other.

---

[3] Plaintiff states it is irrelevant whether the Companies contracted with this vendor as one entity. (AB 12). This fact is not irrelevant because evidence proving they contributed separately to the retirement plans is proof that substantive consolidation does not make sense under the factors of Nesbit. Plaintiff also alleges that the two Companies acted jointly to obtain a benefit. (Id.). This allegation is disproved by evidence of each Company's separate contribution.

All this material evidence under the governing Third Circuit test is unrebutted and it indicates that substantive consolidation is inappropriate. No eggs are scrambled here and it would be inequitable to consolidate. See Nesbit, 347 F.3d at 86.

**B. The Application Of The Four Nesbit Factors Also Results In The Grant of Summary Judgment.**

**1. The Degree of Unity Between the Entities with Respect to Ownership, Management, *and* Business Functions.** The language used by the Court sets forth a conjunctive list of factors, "ownership, management *and* business functions." Nesbit, 347 F.3d at 87 (emphasis added). It is undisputed that there is common ownership. (OB 4, Morgan ¶25, A334; AB 25). However, as the Third Circuit has stated, "*common ownership ...[is an] insufficient bas[is]* to disregard the separate corporate forms of [the two companies]." Id. at 89 (emphasis added). So plaintiff is left with attempting to prove unity between the two Companies with regard to management *and* business functions. However, plaintiff offers no proof of unity between the two Companies with respect to either their management *or* business functions and thus this factor favors the grant of summary judgment.

**(a) The Degree of Unity Between the Entities with Respect to Management.** In defendant's Opening Brief, it showed that the two companies operate under different management. (AB 4, 6; Morgan ¶29, A335; Organizational Charts, A042-43). The Paper Company is managed by Gary Eberhard, and the Packaging Company is managed by James Morgan. (Id.). Yet plaintiff still tries to show through a minutia of immaterial evidence, that there exists a degree of unity with respect to management functions.

**(i) Reimbursed Administrative Services Provided to the Paper Company.** Plaintiff sets forth various instances of administrative services provided to the Paper Company, but none rise to the level of being functions of management and all are reimbursed. Plaintiff offers no evidence that the two companies are managed by anyone other

than Gary Eberhard and James Morgan, respectively. Plaintiff's needless proof of some Packaging Company employees providing administrative services to the Paper Company never proves that these services had any bearing on the "management" of the Paper Company.

**(ii) James Morgan's Participation in the Paper Company in his Official Capacity.** Plaintiff states that James Morgan participated in the Paper Company's personnel matters. (AB 14). But James Morgan is the Paper Company's Vice President and Secretary. (OB 4; Morgan ¶2, 27, A330, 334). While he does not participate in the day-to-day operations of the Paper Company, he certainly is involved in some matters relating to the operation of the Company. (OB 4; Morgan ¶30, A335).

For example, plaintiff cites to a document which Mr. Morgan co-signed with the Paper Company's General Manager, Gary Eberhard setting forth the Paper Company's anti-harassment policy. (AB 15; Exhibit R[4], PA47). However, plaintiff fails to point out that Mr. Morgan signed this policy in his official capacity, "James B. Morgan, Executive Vice President." (Id.).

Plaintiff points out a 1987 letter signed by Mr. Morgan addressed to the Paper Company's former General Manager, Eugene Fox. (AB 15; Exhibit S, PA49). However, plaintiff *again* fails to point out that Mr. Morgan signed this policy in his official capacity, "James B. Morgan, Executive Vice President." (Id.).

Additionally, plaintiff refers to evidence which shows Mr. Morgan was involved in handling a disciplinary matter involving one of the Claimants, Carlyle Moore. (Exhibit P, PA45). But this letter only indicates that Carlyle Moore was not to return to work after he had spoken to *either* Mr. Morgan *or* Mr. Eberhard after the local police department was called because Claimant refused to leave the building after being suspended indefinitely. (Id.). Nowhere does it state that Carlyle Moore *had* to speak with Mr. Morgan exclusively. (Id.). Plaintiff cannot seriously maintain that this letter is evidence of Mr. Morgan's involvement in the Paper

---

[4] Defendant assumes plaintiff is referring to Exhibit R in its Answering Brief.

Company's *day-to-day* operations, because it is extremely doubtful the local police are called to remove a suspended employee from the employer's premises on such a regular basis.

Plaintiff also cites to a memo from a former General Manager for the Paper Company proposing Bonus and Salary Adjustments. (AB 15; Exhibit Q, PA46). However, this memo does nothing but show that Mr. Morgan had some kind of say in the granting of bonuses and salary adjustments. (Id.). Contrary to plaintiff's contention, the memo does not indicate that Mr. Morgan had "final authority" to approve such bonuses and salary adjustments. (Id.).

Finally, plaintiff refers upon a March 2004 memo which discusses how vacation is accrued. (AB 15; Exhibit W, PA70). The government states it shows James Morgan sets personnel policy relating to vacation time for Paper Company employees. (AB 15). However, the document does nothing of the sort. The only mention of James Morgan is at the bottom where a handwritten note states that "J.M. allows them to "buy" vacation." (Exhibit W, PA70). This note does not state that Mr. Morgan sets the personnel policy for the Paper Company employees. (Id.). Plaintiff cannot make this document stand for something that is not readily apparent from its content.

Thus, none of the above evidence proves that Mr. Morgan participated in *any day-to-day* management of the Paper Company. If anything, the evidence plaintiff cites proves that any actions taken by Mr. Morgan with the Paper Company were clearly done in his official capacity. Furthermore, the Third Circuit in Nesbit stated that it is "unsurprising" that a company's president and shareholder will "occasionally participat[e]" in the company's management. 347 F.3d at 88. "*Overlapping ownership and management [of the two companies] are insufficient, without more, to warrant substantive consolidation.*" Id. n.11 (emphasis added).

**(iii) The Paper Company and the Packaging Company's Time and Attendance Policies.** Plaintiff alleges that because the two Companies' employees are subject to identical time and attendance policies that they are "jointly managed." (AB 12, 15).

8

Here Exhibit T is a memorandum from Gary Eberhard to the employees of the Paper Company setting forth "attendance requirements at P.T. Morgan Paper Company." (PA50). But this memorandum does not indicate that these attendance requirements also apply to Packaging Company employees. (Id.). The only mention of the Packaging Company is where the memorandum breaks down the different holidays observed by each company. (Id. at 52). It is patently obvious that the Packaging Company has two more holidays than the Paper Company. (Id.) Yet plaintiff still makes the misstatement that the Companies' employees are subject to identical annual holidays. (AB 12). This document does not prove the two Companies are "jointly managed with regard to certain personnel issues." (Id.). If anything, this document proves the two Companies operate separately and observe distinct holidays.

(b) **The Degree of Unity Between the Entities with Respect to Business Functions.** While the Third Circuit uses a conjunctive list of factors and plaintiff has not proven a degree of unity with respect to management, for the record, defendant submits plaintiff cannot prove unity as to business functions either.

(i) **The Paper Company's Facsimile Communications.** In an attempt to prove what plaintiff calls "significant intermingling," plaintiff points out that a few communications by those Packaging employees providing administrative services to the Paper Company were made using facsimile cover sheets with Packaging Company letterhead. (AB 6, 7, 8; Exhibit G, N, O; PA12, 39, 41). However, plaintiff fails to point out that the words "P.T. Morgan Paper" were manually inserted on the line indicating who the facsimile was from, (Exhibit N, PA39) or that "Packaging" was completely crossed out and "Paper" was written in. (Exhibit G, PA12). The mere use of Packaging letterhead is explained by defendant's admission that some Packaging employees provide reimbursed administrative services to Paper. (Morgan ¶24, A334). In fact, this proves that the Companies were operating at arms length because if they were not, there would be no need to cross out or indicate who the communication was from.

Further, plaintiff alleges that the companies share the same facsimile number. Yet, the evidence proves quite the opposite, that the two companies clearly have separate facsimile numbers. The Packaging Company's facsimile number has a 410 area code. (See Exhibit N, PA 39); the Paper Company's facsimile number has a 302 area code. (See Exhibit P, PA45). Clearly, the two companies have separate facsimile numbers. Yet, plaintiff bases its allegations on Exhibit Z which is a facsimile communication between the Paper Company and the Packaging Company. (PA 73). At the top of the document it indicates it was faxed from a facsimile number with the area code of 302 at 10:09am and that the fax was sent from the Paper Company. (Id.). The line below that shows at 10:07am the fax was sent from the Packaging Company "to" (which is indicated by an arrow) a 302 facsimile number. (Id.). The 302 number matches the fax number at the Paper Company's warehouse in Smyrna, Delaware. (See Exhibit P, PA45). This document does not prove the two companies have the same facsimile number, in fact record evidence proves the exact opposite is true. As a side note, even if the two companies did share a facsimile number as alleged by plaintiff, the fact that they faxed documents back and forth to each other on the same fax machine would be evidence of operating at arms length.

### (ii) The Paper Company's Accounting and Corporate

**Address.** Along these same lines, plaintiff states that the Paper Company lists its accounting address as a PO Box in Severna, Maryland. (AB 7, 8, 10, 11). But the Paper Company's warehouse is located in Smyrna, Delaware while the Packaging Company operates from an address in Arnold, Maryland. (OB 3, 5; Morgan ¶¶4, 5, A330, 331). Previously, the Packaging Company operated from a Severna Park, Maryland address. And because some employees of the Packaging Company provided administrative services, such as accounting and payroll, for the Paper Company, on its letterhead the company previously listed its Accounting address as Severna, Maryland. (Morgan ¶24, A334).

Regardless, the use of a Severna Park, Maryland address for the Paper

Company's accounting department does not show a degree of unity between the two companies as to business functions. It only shows some Packaging employees provided accounting services to the Paper Company which were reimbursed, a fact defendant has already admitted. (Morgan ¶24, A334).

Further, plaintiff correctly states the corporate headquarters for both the Paper Company and the Packaging Company are located at 525 Broadwater Road, Arnold, Maryland. (AB 11). What plaintiff fails to clarify is that this address is also the same address where the companies' owners, James and Peggy Morgan reside. Plaintiff makes mention that the Packaging Company leases a building in a "residential section," but does not make the obvious connection that the corporate addresses are that of the owners of the Companies, not specifically that of the Packaging Company. (AB 11; Exhibit FF, II, 104-13, 119). Then plaintiff attempts to draw a very large and erroneous conclusion without any supporting evidence. (AB 11). Plaintiff alleges that because the defendant has its corporate headquarters listed as an Arnold, Maryland address, and admittedly does not lease or own any space there, the Packaging Company is financially underwriting the Paper Company's use of space. (AB 11). Plaintiff fails to notice that the joint owners of the two companies also reside at this address explaining why the corporate addresses are listed as such. Plaintiff cannot make such a bare allegation that the Packaging Company is financially underwriting the use of leased space without any factual support.

(iii) **The Paper Company and the Packaging Company's**

**Board of Directors Meetings.** Plaintiff cites to certain documents reflecting the minutes taken at Board of Directors meetings for the proposition that the two companies engage in the intermingling of business at these meetings.[5] (AB 15). However, these separate documents actually prove that the two companies operate at arm's length and observe corporate formalities,

---

[5] Plaintiff requested minutes of board meetings for both companies in its written discovery. Defendant produced the documents it had which fit the request. It is plaintiff's choice to characterize these documents as "agenda" and not regard them as minutes. (AB 15).

11

two factors clearly utilized by the Third Circuit in <u>Nesbit</u>. (Exhibit K, PA922-30). Plaintiff attempts to show that two Packaging Company employees attended the Board of Directors Meetings for the Paper Company, but fails to point out that the two employees are the daughters of the owners of the company, Cindy *Morgan* Moss and Marianne *Morgan* Persico. (AB 16 (emphasis added)).

Plaintiff also states that on one occasion business regarding the Paper Company was discussed at the Packaging Company's meeting. (AB 15-16). But plaintiff fails to point out that the substance of the discussion regarded the resignation of the Paper Company's former General Manager and hiring of a new General Manager. (AB 15-16). Plaintiff merely states the discussion regarded the resignation and hiring of a mere "Paper employee." (<u>Id.</u>).

Since the two companies are owned by the same family, it is obvious that the resignation and hiring of a new General Manager was a topic of grave importance. As the Third Circuit held in <u>Nesbit</u>, operational entanglement does not exist even when the president of two companies participates occasionally in their management. 347 F.3d at 89. "[The person's] directorships are likely incidental to his stock ownership, as is often the case among closely held corporations." <u>Id.</u> n11. "[O]verlapping ownership and management [of the two companies] [is] insufficient, without more, to warrant substantive consolidation." <u>Id.</u> The fact that during one Packaging Company Board of Directors meeting the extremely important issue of the resignation and hiring of a new General Manager for the Paper Company was discussed does not establish unity in business functions, or management functions for that matter, and certainly not operational entanglement.

**(iv) Eugene Fox's Bonus from the Packaging Company.** It is admitted that the former General Manager of the Paper Company did receive a bonus from the Packaging Company. (AB 13; Exhibit NN, PA140). Why is not known. However, this fact standing alone certainly does not prove the two companies are scrambled together, to use the

Third Circuit's analogy. More importantly it does not prove there was a "labor management overlap," as alleged by plaintiff (AB 13), which results in total operational entanglement in an equitable context. The Exhibit does nothing but show that he received a bonus, it does not state any context or rationale. (Exhibit NN, PA140). The Third Circuit in <u>Nesbit</u> never addressed the receipt of just an insulated bonus by an employee of one company from another company. In discussing the array of evidence a plaintiff could use to prove that substantive consolidation would make sense due to operational entanglement, the receipt of an insulated bonus was never mentioned. Certainly, in light of the cumulative detail identified by the Circuit Court, this single piece of evidence does not create a material dispute which would prevent the grant of summary judgment. Such a piece of evidence could never lead to a finding of scrambled companies which cannot be put back together.

### 2. Whether the Two Companies Present Themselves as a Single Company.

Second, plaintiff can not prove that third parties deal with the two companies as one unit. In fact, the record evidence proves the exact opposite. Under <u>Nesbit</u>, the two companies must present themselves as a single company such that third parties deal with them as one unit. <u>Nesbit</u>, 347 F.3d at 87. While plaintiff admits that both the Paper Company and the Packaging Company use the same company for payroll services, Paychex, Inc., it fails to address defendant's proof that each company has *separate* contracts and accounts. (OB 17; A252, 263). Plaintiff also fails to address defendant's proof that each company has *separate* health plans with *different* medical insurance providers. (OB 17; Morgan ¶18; A333; Health Plans Contracts; A193-251). Further, the government does not address defendant's proof that each company writes *separate* checks, (compare A177 with A185), files *separately* for worker's compensation insurance, (A165, 173), and has *separate* retirement benefit plans, (A177, 185). Further proof which plaintiff ignores is that they keep *separate* financial records and have separate bank accounts. (Morgan ¶20, A333-34). Thus, third parties do not deal with the two companies as one unit.

Instead, in attempting to prove the two companies "have an intertwined identity to the outside world," plaintiff focuses on misconstruing the operations between these two companies. Plaintiff correctly states that the Packaging Company is a broker/distributor of correlated goods. (AB 12). It also states that the Packaging Company does not independently operate a facility which distributes a product. (Id.). Plaintiff then makes the statement that Paper is the "distributor" of such products and that the Packaging Company acts as the sale office for such products. (Id.).

Obviously, plaintiff failed to understand the business relations between these two companies, despite defendant's attempt to illustrate through testimony and record evidence. (see Opening Brief 3-4, 5, 8-9; Morgan ¶¶4-6, 19, 30-32, A330-31, 333,335). The Paper Company makes bales of paper from paper trash and recycled fiber, ships them out and distributes some finished goods, such as dust pads and tree wraps. (Morgan ¶4, 31, A330, 335). The Packaging Company is a broker/distributor of manufactured goods. (Morgan ¶5, A331). The common definition of "broker" is one who acts as a negotiating agent for contracts, sales, or purchases in return for payment. (Webster's Deluxe Edition Dictionary & Thesaurus (2001), 86; Exhibit 1). The common definition of "distributor" is one who distributes as a wholesaler. (Id. at 191).

So plaintiff's contention that the Packaging Company does not independently operate a facility which distributes a product is correct, but it is entirely irrelevant. Defendant never claimed that the Packaging Company is a manufacturer or producer of such goods. It is merely the broker/distributor. (Morgan ¶5, A331). And as defined, it does not need an independent facility to be a broker or distributor.

Plaintiff also cites to an invoice which shows the Packaging Company receiving payment for products being shipped from the Paper Company. (Exhibit E; PA7). This "evidence" is only proof of how the companies do business, not proof that third parties deal with the two companies as a single unit.

14

**3. Whether a Parent Company Covers the Salaries, Expenses, or Losses of its Subsidiary.** Under the third factor, plaintiff cannot prove that a parent company covers the salaries, expenses, or losses of its subsidiary. Plaintiff claimed, "[d]efendant states 'neither Company covers the salaries, expenses, or losses of the other." (AB 10). The correct statement by defendant in its Opening Brief was, "since these Companies are not in a parent-subsidiary relationship, neither Company covers the salaries, expenses or losses of the other." (OB 17). Here, defendant was simply responding to the language used in <u>Nesbit</u> which refers to a *parent company* covering the salaries, expenses, or losses of its *subsidiary*. <u>Nesbit</u>, 347 F.3d at 87 (emphasis added). Obviously, the Packaging Company and Paper Company are not in a parent-subsidiary relationship because neither company owns all the stock of the other company. (Morgan ¶15, A332). Therefore, there is no evidence in this case of a parent covering the salaries, expenses, or losses of its subsidiary, and on this factor, as well as the previous two factors, the defense lacks material evidence to prove jurisdiction.

However, assuming *arguendo* that this factor was not limited to the parent-subsidiary context, plaintiff still cannot prove that one company covers the salaries, expenses, or losses of the other. While defendant admits there are no contracts between the Paper Company and the Packaging Company for services, (Exhibit DD, PA94), neither company covers the salaries, expenses or losses of the other. And the absence of any contracts for services does not prove otherwise. The fact that Packaging Company employees provide administrative services to the Paper Company which are reimbursed, does not prove one company covers the salaries, expenses, or losses of the other.

Also, plaintiff cites to a Dunn & Bradstreet report of the Packaging Company which allegedly reveals that the Paper Company and the Packaging Company have "joint responsibilities for loans from various lenders." (AB 11; Exhibit FF, PA104-13). Conveniently, plaintiff cites to this report but fails to provide any specific statement which makes this assertion.

However, if one searches, it appears that plaintiff is referring to a section entitled "Affiliate" which identifies the Paper Company. (Exhibit FF, PA106). This section clearly states, "[t]he following is related through common ownership *and/or* financial interest." (Id. (emphasis added)). So essentially, the Paper Company and the Packaging Company could be linked as affiliates, according to this report, solely based on their common ownership, which is not in dispute, and not their financial interest. So this section of the report does not prove the two companies have joint responsibilities for loans.

The only other relevant section pertaining to loans merely states there were various UCC filings describing the collateral of the Packaging Company. (Exhibit FF, PA112). The two references to loans are continuation security loans with the Maryland National Bank, Baltimore, MD and The Nationsbank - Bank of America. (Id.). The first loan with the Maryland National Bank lists the debtor as "The P.T. Morgan Paper Company and others." (Id.). The second loan with the Nationsbank lists the debtor as "The P.T. Morgan Paper Company." (Id.). But standing alone, loans between two separate companies is not enough to prove the two companies are operationally entangled and thus appropriate for substantive consolidation under Nebsit. This report does not prove that the Packaging Company was covering all the salaries, expenses, or losses of the Paper Company.

**4. Whether One Entity does Business Exclusively with the Other.** Finally, under the fourth factor, the plaintiff has not shown that the two companies do business exclusively with each other. In fact, plaintiff never even contends that they are the exclusive source of business with each other. But as defendant explained in its Opening Brief, while the Packaging Company may act as the broker/distributor for some of Paper's finished goods, it is not the sole source of distribution. (OB 8; Morgan ¶¶30-32, A335). Similarly, Packaging is the broker/distributor for other companies aside from Paper Company. (OB 8; Morgan ¶¶30, 32, A335). The two companies may do business with each other, but neither does business

exclusively with the other. In fact, plaintiff is unable to refute such an assertion because defendant produced record evidence indicating each company had separate customers and even named a few of them. (Morgan ¶¶31-32, A335).

Thus, under the four operational factors which are decisive to the question of jurisdiction the government can offer no evidence to show a material dispute over the evidence offered by defendant and summary judgment is appropriate.

## II.    PLAINTIFF MISSTATES THE RECORD REGARDING ITS INVESTIGATOR.

The government's argument is factually at odds with the actual notes of the July 9, 2004 telephone conversation between its investigator Mark Maddox and the Packaging Company's accounting employee, Robbi Smith. Plaintiff's brief states that when Mr. Maddox called James Morgan to discuss his investigation, Ms. Smith informed him he was unavailable. (AB 17). Plaintiff states he then "identified himself and asked if she could tell him how many individuals were employed by *P.T. Morgan company*." (Id. (emphasis added)). Plaintiff states that Ms. Smith answered there were "at least 19 employees." (Id.). But here defendant contended that Mr. Maddox only asked Ms. Smith how many total employees there were for "P.T. Morgan." (OB 9) because these were Mr. Maddox's own handwritten notes taken during the conversation which clearly stated that the subject of the conversation was "the total number of employees for *PT. Morgan*." (Id.; A271 (emphasis added)).

However, in a sham affidavit Mr. Maddox now contradicts his own handwritten notes and claims "I proceeded to identify myself and asked if she or anyone else could tell me how many individuals were employed by the Respondent, *P.T. Morgan Paper Company*." (Exhibit PP, PA143 ¶6 (emphasis added)). In his affidavit, Mr. Maddox also indicates his notes made contemporaneously with the telephone conversation are attached as Exhibit A. (Id. at PA144 ¶7). Yet the only Exhibit A given to defendant is an employee chart for the Packaging Company and no other documents preceded or succeeded his affidavit. (Exhibit A, PA1). Consequently,

17

defendant is left to rely on Mr. Maddox's notes previously produced by the plaintiff. (A271).

Consequently, plaintiff has either misstated the facts in its Answering Brief, or Mr. Maddox has sworn to something which appears to be untrue. Such questionable evidence should not prevent the grant of summary judgment. Clearly the government's initial prosecution of this case was based on sloppy investigative techniques. If its investigator had carefully addressed the jurisdictional issue, this small corporate defendant could have been spared the ordeal of this expensive case.

## III.    PLAINTIFF HAS FAILED TO FILE A SUFFICIENT RULE 56(f) AFFIDAVIT.

Because defendant has moved for summary judgment on the sole issue of whether it can be substantively consolidated with a legally distinct company under Third Circuit law only facts showing substantive consolidation are relevant and material to the grant of summary judgment. Here Rule 56(f) only allows a court to refuse an application for summary judgment or to order a continuance to allow additional discovery if it appears from affidavits of the party opposing summary judgment that the party cannot present facts essential to its position. Fed. R. Civ. P. 56(f). A Rule 56(f) affidavit must identify "with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." Bradley v. U.S., 299 F.3d 197, 206 (3d Cir. 2002); accord Miller v. Daimler Chrysler Corp., 219 F.R.D. 331, 332 (D.Del. 2003). Here, plaintiff's counsel's affidavit fails to meet Rule 56(f)'s requirements because it fails to state with specificity what information is sought. (Unsworn Declaration of M. Jean Clickner, Exhibit RR-1, PA150). Plaintiff's counsel merely states that plaintiff has not taken any depositions and that if necessary it will seek "additional information to support its summary judgment position at upcoming depositions." (Id.).

In its Answering Brief, plaintiff tries to have it both ways. It repeatedly makes the plea that it needs more discovery and that defendant has thwarted its ability to engage in full and

complete discovery of the nature of the relationship between the two companies. (AB 4). Yet in the same exact sentence, plaintiff turns around and states the evidence included in its adjoining Appendix clearly supports a finding of an integrated enterprise. (Id.). In fact plaintiff states, "the Commission has shown a *plethora* of ... facts which establish an integrated relationship..." (AB 24). Plaintiff cannot take this position and then claim it needs more undefined discovery.

Plaintiff had an opportunity to file a Rule 56(f) affidavit stating with specificity what evidence it needed to support its position, how it would preclude summary judgment, and why it has not previously been obtained. Bradley, 299 F.3d at 206; accord Miller, 219 F.R.D. at 332. Using experienced counsel it choose not to do so. Its time has come and gone to either offer evidence proving a genuine issue of material fact precluding the grant of summary judgment or with specificity to indicate why it has not had the time to do so. Instead, plaintiff decided to generally allege defendant had thwarted its discovery and has offered no specificity. (AB 4). Further, counsel's affidavit failed to state even one category of evidence it was lacking in order to prove its position. (Exhibit RR-1, PA150).

## CONCLUSION

Defendant should be granted summary judgment. Plaintiff cannot prove through record evidence that substantive consolidation makes sense under Third Circuit law. Nesbit, 347 F.3d at 72. Quite simply, at best all the plaintiff can do is point to one, two or three instances of sloppy record keeping by two small closely held corporations. Yes they are small, but they are not giants like DuPont or General Motors. Just because they do not have sophisticated operational systems does not mean they are operationally entangled. No eggs are scrambled here and as a matter of law there is insufficient proof otherwise. Equity demands no less.

Plaintiff, through the use of a highly questionable sham affidavit by its investigator, also has continued to defy the Court's instructions addressed specifically to the EEOC that it should "do what is right, not just win." (D.I.33, (Telephone Conference before the Court [Nov. 9, 2005])

19

p.7 line 10; A001).

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Defendant

Dated: January 13, 2006

# EXHIBIT 1

# WEBSTER'S
# DELUXE EDITION

## DICTIONARY & THESAURUS

## CONTAINS

## U.S., CANADIAN, & WORLD ATLASES

## COMPUTER DICTIONARY

## &

## GRAMMAR GUIDE



**Publishing Group**

Copyright © 2001 V. Nichols
Imprint of Allied Publishing Group, Inc.
Printed in U.S.A.
No part of this publication may be reproduced or copied
in any form without the written permission
from the copyright owner.

**broken—down** *adj.* Shattered or collapsed; ruined.

**bro-ken-heart-ed (brō´ken här´tid)** *adj.* Overcome by despair or grief.

**broken home** *n.* A family situation in which the parents are not living together.

**bro-ker (brō´kėr)** *n.* A person who acts as a negotiating agent for contracts, sales, or purchases in return for payment.

**bro-ker-age (brō´kėr ij)** *n.* The establishment of a broker.

**brome-grass (brōm´gras˝)** *n.* A type of tall grasses having sagging spikelets.

**bro-me-li-ad (brō´mē lē ad)** *n.* The family of tropical American plants including the pineapple.

**bro-mide (brō´mīd)** *n.* A compound of bromine with other elements; a sedative; a commonplace idea or notion; one who is tiresome. **bromidic** *adj.*

**bro-mine (brō´mēn)** *n.* A nonmetallic element of a deep red, toxic liquid that gives off a disagreeable odor.

**bro-mo (brō mō)** *n.* An effervescent mixture used as a sedative or a headache remedy.

**bron-chi (brong kī´)** *n.* Plural of *bronchus.*

**bron-chi-al (brong´kē al)** *adj.* Pertaining to the bronchi or their extensions, through which air flows to reach the lungs. **bronchially** *adv.*

**bron-chi-tis (brong kī´tis)** *n.* An acute inflammation of the bronchial tubes.

**bron-cho-scope (brong´ka skōp˝)** *n.* A tubular instrument which is illuminated for inspecting the bronchi.

**bron-chus (brong´kus)** *n.* Either of two main branches of the trachea that lead directly to the lungs.

**bron-co (brong´kō)** *n.* A wild horse of western North America.

**bron-co-bust-er (brong´kō bus˝tėr)** *n.* The man who breaks wild horses.

**bron-to-saur (bron´ta sor˝)** *n.* A very large dinosaur which grew to a height of 12 feet and a length of over 70 feet.

**bronze (bronz)** *n.* An alloy of tin, copper, and zinc; moderate olive brown to yellow in color. **bronze** *v.* **bronze** *adj.*

**Bronze Age** *n.* Human culture between the Iron Age and the Stone Age.

**brooch (brōch)** *n.* A large decorative pin.

**brood (brōd)** *n.* The young of an animal; a family of young. **brood** *v.* To produce by incubation; to

hatch; to think about at length.

**brood-er (brōd er)** *n.* An enclosed heated area for raising young chickens.

**brook (brek)** *n.* A small freshwater stream that contains many rocks.

**brook trout** *n.* A cold—water fish of eastern North America.

**broom (brōm)** *n.* A long-handled implement used for sweeping; a shrub with small leaves and yellow flowers.

**broom-stick (brōm´stik˝)** *n.* The handle of a broom.

**bros** *abbr.* Brothers.

**broth (broth)** *n.* The liquid in which fish, meat, or vegetables have been cooked; also called stock.

**broth-el (broth´l)** *n.* A house of prostitution; whorehouse.

**broth-er (bruth´ėr)** *n.* A male who shares the same parents as another person.

**broth-er-hood (bruth´ėr hed˝)** *n.* The state of being brothers; one that is related to another for a particular purpose.

**broth-er—in—law (bruth´ėr in lo˝)** *n.* The brother of one's spouse; the husband of one's sister; the husband of one's spouse's sister.

**broth-er-li-ness (bruth´ėr lē nes)** *n.* State of being brotherly.

**broth-er-ly** *adj.* Characteristic of or befitting brothers.

**brough-am (brö´am)** *n.* A vehicle without a cover over the driver's seat.

**brought** *v.* The past tense of bring.

**brow (brou)** *n.* The ridge above the eye where the eyebrow grows.

**brow-beat (brou´bēt˝)** *v.* To bully; dominate; intimidate.

**brown (broun)** *n.* A color between yellow and red; a dark or tanned complexion.

**Brown Betty** *n.* A pudding baked with apples, spices, and bread crumbs.

**brown bread** *n.* Bread made from whole wheat flour.

**brown-ie (brou´nē)** *n.* A good-natured elf believed to perform helpful services; a square, chewy piece of chocolate cake.

**brown-out (broun´out˝)** *n.* An interruption of electrical power.

**brown sugar** *n.* Sugar with crystals covered by a film or refined dark syrup.

**Brown Swiss** *n.* A breed of brown dairy cattle, originally from Switzerland.

**browse (brouz)** *v.* To look over something in a leisurely

Case 1:04-cv-01304-KAJ    Document 55    Filed 04/19/2006    Page 29 of 30

tisfy to distill

Capable of being

in morals; lacking
. **dissoluteness** n.
The act or process
form; termination
dy and soul; death
) solution, such as
me, as by emotion;
osed; to terminate.

ance that converts

< of agreement; a
eable combination
. **dissonantly** adv.
e course of action;
uasion or advice.
**uasive** adj.

ff for holding the
he female side of
**taff** adj.
te from the point
from the center.

in time or space;
n two points; the
ied points in time;
oofiness. **distance**
. at a distance.
ated by a specified
; from, going to,
elated. **distantly**,

ersion to; dislike
**istastefully** adv.

umor or temper,
of dogs, marked
netimes nervous
**distemper** v. To

internal pressure,
.on n.
w lines of poetic

illation; to give
r n. **distillery** n.

---

**dis-til-late (dis´ ti lit)** n. The condensed substance separated by distillation.

**dis-til-la-tion (dis´ ti lā´ shan)** n. The act or process of heating a liquid or other substance until it sends off a gas or vapor and then cooling the gas of vapor until it returns to a liquid or solid form, thus separating impurities.

**dis-tinct (di stingkt´)** adj. Distinguished from all others; separated or distinguished by some feature; not the same in number or kind; different; clearly seen; unquestionable; one of a kind. **distinctly** adv. **distinctness** n.

**dis-tinc-tion (di stingk´shan)** n. The act of distinguishing; a difference; a special honor or recognition.

**dis-tinc-tive (di stingk´tiv)** adj. Serving to give style or distinction to something. **distinctiveness** n.

**dis-tin-guish (di sting´gwish)** v. To recognize as being different; to discriminate; to make something different or noticeable. **distinguishable** adj. **distinguished** adj. **distinguishably** adv.

**dis-tort (di stort´)** v. To twist or bend out of shape; to twist the true meaning of; to give a misleading account of. Slang Blow out of shape. **distortion** n.

**dis-tract (di strakt´)** v. To draw or divert one's attention away from something; to cause one to feel conflicting emotions. **distract** n.

**dis-trac-tion (di strak´shan)** n. The act of distracting; that which distracts.

**dis-trait (di strā´)** adj. Absent-minded.

**dis-traught (di strot´)** adj. Deeply agitated with doubt or anxiety; crazed.

**dis-tress (di stres´)** v. To cause suffering of mind or body. **distress** n. Pain or suffering; severe physical or mental strain; a very painful situation. **distressing** -ly adv.

**dis-trib-ute (di strib´ūt)** v. To divide among many; to deliver or give out; to classify. **distribution** n. **distributive** adj.

**dis-trib-u-tor (di strib´ūt ér)** n. One who distributes, as a wholesaler; a device that directs electrical current to spark plugs of an engine.

**dis-trict (dis´trikt)** n. An administrative or political section of a territory; a distinctive area. **district** v.

**district attorney** n. The public prosecuting officer of a judicial district.

**District of Columbia** n. The capital of the United States of America; the only part of the continental

---

United States which is not a state, is not part of a state, and does not have a voting congress person in the House of Representatives or an elected senator.

**dis-trust (dis trust´)** n. Suspicion; doubt. **distrust** v. To doubt; to suspect; to question someone or thing. **distrustful** adj. **distrustfully** adv.

**dis-turb (di stérb´)** v. To destroy the tranquillity or composure of; to unsettle mentally or emotionally; to interrupt or interfere with; to bother someone. **disturber** n.

**dis-turb-ance (di stér´bans)** n. The act or state of disturbing; agitation.

**dis-un-ion (dis ūn´yon)** n. The termination of a union; separation.

**dis-u-nite (dis´ū nīt´)** v. To divide or separate.

**dis-u-ni-ty (dis´ū nit´ē)** n. Discord; lack of unity.

**dis-use (dis ūs´)** n. The state of not using; out of use.

**dis-u-til-i-ty (dis´ū til´i tē)** n. The state of causing inconvenience or fatigue; harm; counterproductive.

**di-syl-la-ble (dī´sil a bl)** n. A word having two syllables.

**ditch (dich)** n. A trench in the earth; a trench made by digging in the earth, particularly for draining wet land. **ditch** v. To dig a ditch in; to surround with a ditch. Slang To discard; to get rid of something; to land a disabled aircraft on water.

**ditch digger** n. A person or machine that digs ditches.

**ditch reed** n. A tall reed with broad flat leaves found in damp areas of North America.

**dith-er (dith´ér)** n. A state of nervousness or indecision; commotion.

**dit-to (dit´ō)** n., pl. **dittos** An exact copy; the same as stated above. **ditto mark** The pair of marks ( ") used to substitute for the word ditto. **ditto** adv.

**dit-ty (dit´ē)** n.  A short, simple song.

**ditty bag** n. A small bag used by sailors to hold small articles, such as thread, buttons, and other small personal effects.

**di-u-ret-ic (dī´ū ret´ik)** adj. Tending to cause an increase in the flow of urine. **diuretic** n. A drug given to increase the amount of urine produced.

**di-ur-nal (dī er´nal)** adj. Having a daily cycle or recurring every day; of, relating to, or occurring in the daytime; opening in the daytime and closing at night.

**di-va (dē´vä)** n., pl. **divas** or **dive** A prima donna; a female opera star.

**di-van (di van´)** n. A long, backless and armless sofa or couch.

**D**

## CERTIFICATE OF SERVICE

I, Thomas S. Neuberger, being a member of the bar of this Court do hereby certify that

on January 13, 2006, I electronically filed this **Reply Brief** with the Clerk of the Court using

CM/ECF which will send notification of such filing to the following:

> M. Jean Clickner
> Senior Trial Attorney
> Equal Employment Opportunity
> Commission
> 1001 Liberty Avenue, Suite 300
> Pittsburgh, PA 15222
> (412) 644-6439
> jean.clickner@eeoc.gov

> Seth M. Beausang
> Asst. U.S. Attorney
> The Nemours Building
> 1007 Orange Street, Suite 700
> Wilmington, DE 19899
> (302) 573-6277
> seth.beausang@usdoj.gov

> /s/Thomas S. Neuberger
> **THOMAS S. NEUBERGER, ESQ.**

PTMorgan/Briefs/Summary Judgment.-Reply Brief. - FINAL