IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CIVIL ACTION NO. 04-1304 (KAJ) ) |
| P.T. MORGAN PAPER CO., affiliated with P.T. MORGAN PACKAGING COMPANY, | ) ) ) |
| Defendant. | ) ) ) |

PLAINTIFF EEOC'S SUPPLEMENT TO ITS
BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
and
BRIEF IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

JACQUELINE H. MCNAIR, REGIONAL ATTORNEY
JUDITH O'BOYLE, SUPERVISORY TRIAL ATTORNEY
M. JEAN CLICKNER, SENIOR TRIAL ATTORNEY
Equal Employment Opportunity Commission
Liberty Center, Suite 300
1001 Liberty Avenue                          Local Counsel:
Pittsburgh, PA 15222                          **UNITED STATES ATTORNEY**
(412) 644-6439                                **DISTRICT OF DELAWARE**

SETH M. BEAUSANG, ASST. U.S. ATTORNEY
The Nemours Building
1007 Orange Street, Suite 700
Wilmington, Delaware 19899
Del. Bar ID No. 4071
(302) 573-6277

# TABLE OF CONTENTS

Page

**SUPPLEMENTAL COUNTER-STATEMENT OF MATERIAL FACTS** . . . . . . . . . . . . . 1

**P.T. Morgan Paper Company and P.T. Morgan Packaging Company are
operated as an Integrated Enterprise** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Brief Explanation of the business of the Paper and Packaging Companies

    B.   Packaging employees provide administrative and accounting
support for the Paper company. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.   Compensation for Packaging Company's administrative support was not
determined at arm's-length. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    D.   Packaging and Paper corporate offices are housed at the same location. . 6

    E.   Packaging and Paper share liability for financial loans. . . . . . . . . . . . . . 7

    F.   A Paper employee received a bonus from the Packaging company. . . . . . 7

    G.   A Packaging employee works onsite at Paper at least one day a week. . . . 8

    H.   Intermingling of management functions – James Morgan provides
administrative and personnel control for both Paper and Packaging. . . . . 8

    I.   Paper Company provides Packaging Company warehousing services for
which it is not compensates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    J.   Packaging Company purchases products manufactured by Paper Company
without affording Paper a profit on the transaction. . . . . . . . . . . . . . . . 10

    K.   Packaging Company runs a part of it business out of the Paper facility . .10

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    **I.     STATEMENT OF RELEVANT LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    **II.    APPLICATION OF THE FACTS TO THE LAW** . . . . . . . . . . . . . . . . . . . . 17

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

i

**TABLE OF CITATIONS OF CASES, STATUTES, RULES,
TEXTBOOKS AND OTHER AUTHORITIES**

**FEDERAL CASES**                                                                    **Page**

Artis v. Francis Howell North Band Booseter Ass'n, Inc., 161 F.3d 1178, 1184 (8th Cir. 1998)  14

Battistone v. Sam Jon Corp., 2002 U.S. Dist. LEXIS 19399 (E.D. PA 2002) . . . . . . . . . . . . . . . 15

Bennett v. Picarri Press, Inc., 2005 U.S. Dist. LEXIS 1905 (E.D. PA 2005)  . . . . . . . . . . . . . . 15

Ferrell v. Harvard Industries, Inc. et al., 2001 U.S. Dist. LEXIS 17358 *70-71 (E.D. PA 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Gonzalez v. Comcast Corporation, et al., 2004 U.S. Dist. LEXIS 14989 (D. DE 2004) . . . . . . . 15

Gorman v. Imperial Metal & Chemical Co., 1999 U.S. Dist. LEXIS 1810 (E.D. PA 1999) . . . . 13

Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1184 (10th Cir. 1999) . . . . . . . . . . . . . . . . . 14

Nesbit v. Gears Unlimited, Inc., 347 F.3d 72 (3rd Cir. 2003)  . . . . . . . . . . . . . . . . . . . . . 13, 14, 15

Nunez v. Temple Professional Associates, 2005 U.S. Dist. LEXIS 2776 *7 (E.D. PA 2005) . . 13

Pearson v. Component Tech. Corp., 247 F.3d 471, 486 (3rd Cir. 2001) . . . . . . . . . . . . . . . . . 14

Trevino v. Celanese Corp.,701 F.2d 397, 403-04 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . 14

## SUPPLEMENTAL COUNTER-STATEMENT OF FACTS

On January 24, 2006, the Commission took the deposition of James Morgan, one of the two owners[1] of the P.T. Morgan Packaging Company (referred to hereafter as "Packaging Company" or "Packaging") and of the P.T. Morgan Paper Company (referred to hereafter as "Paper Company" or "Paper"). The instant Supplement is based on the information obtained in that deposition; it adds further support to the Commission's contention that the Paper and Packaging Companies are operated as an integrated enterprise for purposes of Title VII as set forth in the Commission's Cross-Motion for Summary Judgment and in its Response in Opposition to the Defendant's Motion for Summary Judgment.

### P.T. Morgan Paper Company and P.T. Morgan Packaging Company are Operated as an Integrated Enterprise

### A.    Brief Explanation of the business of the Packaging and the Paper Companies

The Packaging Company works out of a small office building located in a residential area of Arnold, Maryland. The only employees it has identified are Mr. Morgan, an office manager, two sales representatives, two customer service representatives, and an accounting person. Technically, the Packaging Company does not manufacture a product. It touts itself as simply a broker of new, used, and recycled paper products. (Morgan dep. 12-16)[2] In particular, Packaging sells corrugated pads and lines that are manufactured by the Paper Company. Packaging Company also buys and

---

The second owner, Peggy Morgan, wife of James Morgan, is reportedly very ill and is unable to be deposed or to otherwise participate in this litigation.

"Morgan dep. _" refers to the deposition transcript of James Morgan created from his January 24, 2006 deposition taken by the Commission.

sells new corrugated boxes, some of which are warehoused at the Paper location. The Packaging company does not "touch" a product. (Morgan dep. at 12)

The Paper Company performs four distinct functions at its facility in Smyrna, Delaware. It buys and warehouses new corrugated cartons, which are sold to third parties by either it or the Packaging Company. The Paper Company buys used paper products which it separates and bales. These bales are then sold exclusively by the Paper Company to third parties. (Morgan dep. 14-17) The Paper Company manufactures two products, corrugated pads or liners. These products, created out of recycled paper, are produced to specification pursuant to purchase orders obtained primarily from Packaging customers. (Morgan dep. 16-26) For example, the Packaging Company has customers with specific needs; it relays those orders to Paper who produces the product to specification. (Morgan dep. 90-91, 96-97, 112) The Packaging Company then sells that product, produced by the Paper Company, to its customers. (*Id*) Paper Company warehouses corrugated boxes purchased for resale by the Packaging Company. (Morgan dep. 100) Paper Company also has a shipping dock; it owns two truck cabs and it owns or leases approximately eighteen trailers. (Morgan dep. 54, 69-70)

### B. Packaging Company employees provide extensive administrative and accounting and personnel support for the Paper Company

In its initial brief in support of its cross-motion and in opposition to the Defendant's motion for summary judgment, the Commission argued that Packaging Company personnel provide "significant" administrative and personnel support to the Paper Company. As the Commission learned from Mr. Morgan, Packaging employees provide almost all of the administrative functions related to the business of operating the Paper Company.

As an overview, Packaging employees perform the following functions for the Paper Company:  (1) creating Invoices; (2) billing Paper customers upon receipt of proof of delivery; (3) follow up with delinquent accounts; (4) receiving payments, depositing payments, and maintaining accounts receivable reports; (5) crediting accounts receivables upon receipt of payment; (6) maintaining all financial records for the creation of regular financial reports; (7) providing Mr. Morgan with weekly accounts receivable reports; (8) reporting time and pay information to an outside payroll service; (9) paying Paper's bills out of Paper accounts; (10) handling Paper's transition to a new computer system, training Paper's general manager on the computer, and managing problems with the computer interface between the two companies; (11) handling problems and issues relating to Paper's move from its current location to another, including interfacing with the building contractor on the new building and interfacing with the municipality on zoning issues; (12) handling the compilation of documents and information required for the instant litigation; and (13) determining Paper's cost of producing corrugated pads and liners for Packaging customers.

Mr. Morgan's testimony reveals that the majority of Paper's sales and payment processing is handled by Packaging Company employees.  As he explained, when a customer orders a product from Paper, a purchase order may be created by Morgan, Paper's general manager, a senior Paper employee, or a commissioned sales rep.  (Morgan dep. at 27-28) Paper employees then create a Bill of Lading to accompany the shipment, a copy of which is sent to Packaging office. (*Id*. at 28-30) Upon receipt of delivery confirmation, that information is likewise sent to the Packaging office, where an Invoice is created and sent to the customer and an entry is made into Paper's accounts receivable ledger by Packaging's accountant.  (*Id*. 30, 32).  The invoice indicates that payment should be made to Paper's post office box in Severna Park, Maryland.  All mail sent to that box is

retrieved by a Packaging employee who returns to Packaging office and sorts it. (*Id*. at 31) Payments from Paper customers are handled by Packaging's accountant who deposits the money and adjusts the accounts receivables ledger accordingly. (*Id*. at 32) If a Paper account becomes delinquent or some other problem arises with an account, that problem may be handled by Morgan, a Packaging employee, or Paper's general manager. (*Id*. at 33-36)

Packaging employees provide other significant financial services to Paper, including preparing it's financial statements and running its profit and loss statements. (*Id*. at 45-46) In fact, Packaging employees handle the financial end of Paper's business. (*Id*. at 46).

Mr. Morgan confirmed that a Packaging employee interfaces with third party service providers on behalf of Paper employees, including the payroll processing company, Paychex (Morgan dep. 61-62), and the medical insurance carrier. (Morgan dep. at 60) Additionally, another Packaging employee interfaces between a finished box vendor and the Paper company. (Morgan dep. at 68) This same employee coordinates the delivery of products when both Paper and Packaging products are being delivered on the same truck. (*Id*. at 68)

Importantly, Packaging Company's office manager (Rose Grabowski) has spent a significant amount of time providing services to Paper installing a new computer system at Paper and inputting data into the computer, for the management of Paper's inventory control and evaluation. She also is charged with training Paper's general manager how to use the computer system. (Morgan dep. at 42-44) This employee has gathered and produced information for the Paper in furtherance of the instant litigation. (*Id*. at 44)

In what would seem to be a "purely" Paper function, Ms. Grabowski has taken the lead in representing the Paper Company in negotiations with the building contractor who has been hired to

construct Paper's new facility, as well as to deal with the municipality regarding zoning issues related to Paper's relocation. (*Id.* at 44-45) According to Mr. Morgan, this has taken a "tremendous" amount of time. (*Id.* at 45)

### C.    Compensation for Packaging Company's administrative support was not determined at arm's-length

Despite its several denials of the existence of contracts for services and its statement that "neither Company covers the salaries, expenses, or losses of the other," (see Commission's Answering Brief at 10 reviewing information previously provided by Defendant), Mr. Morgan testified that, in fact, the Paper Company pays the Packaging Company a fixed $2,000.00 each month for the administrative services provided to Paper by Packaging employees.[3]

Since the early 1990s, the Paper Company has paid the Packaging Company $2,000.00 monthly to compensate for administrative and accounting services. (Morgan dep. 48-51) That amount has not changed over the ten plus years since its inception. Morgan admitted that there is no objectively quantifiable basis for the amount paid. Neither company engaged due diligence to determine an appropriate amount. Rather, the owners just set a figure, a "guestimate." (*Id.* at 51)

Moreover, the type of services provided has grown, while the amount paid has remained static. Morgan admitted that Packaging employees are providing more services now than in the mid-1990s. (*Id.* at 51) In the beginning, Packaging employees simply provided "accounting" services. (*Id.* at 51) Now, Packaging's Rose Grabowski travels a 140 mile round trip, several times monthly[4]

---

Moreover, as stated more fully below, Packaging also pays significant amounts to reimburse Paper for salaries and expenses of the Paper operation.

According to Mr. Morgan, Ms. Grabowski's time at the Paper location graduated from one day a month in January, 2005 to twice weekly in November, 2005.

to perform all the duties set forth above, yet the amount of compensation between the companies has not changed. (Morgan dep. 49) In fact, Morgan admitted, the Packaging Company reimburses Ms. Grabowski's travel expenses, not the Paper Company. (Morgan dep. at 50)

Based on the abbreviated discovery period set by the Court, the Commission has not had the opportunity to obtain an expert witness to report on whether, from a business perspective, the reimbursement structure between the companies is reasonable. Certainly the history of this arrangement, and the fact that the reimbursement amount has not changed over ten years to reflect inflation and economic realities, or to reflect the extensive extra work being provided by Ms. Grabowski, may support an inference that this arrangement is not an arm's-length agreement between two independently operated companies. There was no negotiation over the oral contract; there has been no amendment to the agreement in ten years, despite changing circumstances; and, there has been no process or due diligence used to determine the actual value of the services rendered if purchased outside this intermingled association.

### D.    Packaging and Paper corporate offices are housed at the same location

Interestingly, although the Paper production facility is located in Smyrna, Delaware and its management staff  is located there, Paper lists its corporate headquarters as 525 Broadwater Road, Arnold, Maryland[5], the same address where Packaging employees work. Despite the fact that Packaging Company's Robbi Smith, an accountant, spends approximately 40 % of her time on Paper business, Rose Grabowski, Packaging office manager spends 20 % of her time on Paper business, and Joan Meyers, Customer Service, spends 5 % of her time on Paper business, (Morgan dep. at 67-

---

Prior to moving to the Arnold, MD address, both Paper and Packaging shared corporate offices at Severna Park, MD. (Morgan dep. at 31, 37)

68), Defendant has not informed that Paper reimburses Packaging for any portion of the overhead costs of maintaining its offices and equipment at the Arnold, Maryland location.

### E.    Packaging and Paper share liability for financial loans

Mr. Morgan admitted, without specificity, that the assets of one company are used to guarantee the loans of the other. (Morgan dep. at 104-107) When asked what benefit one company would receive from acting as guarantor on a loan to the other company, Mr. Morgan admitted that the answer is tied up in the "intercompany business," as discussed herein. Moreover, the primary reason for the use of these assets is to protect the financial welfare of the owners, Mr. and Mrs. Morgan, who are the "ultimate guarantors" on all loans. (Morgan dep. at 107)   It is clear that the Morgans are using the assets of the two companies, interchangeably, for their own purposes.

### F.    A Paper employee received a bonus from the Packaging company

Mr. Morgan admitted that the former Paper general manager, who was never a Packaging Company employee, had received several "arbitrary" bonuses from the Packaging Company.[6] (Morgan dep. 70-74) When asked why the Packaging Company would award a Paper Company employee a bonus, Morgan answered, "In recognition of the good job he had done." Upon further probing and in response to a question about how the success of the Packaging company was impacted by the Paper company, Morgan responded, "Generally speaking, not much except for the services it provides." (*Id.* at 71) The "services" referred to were the "warehousing of generic boxes that can be sold by either one of the companies and the manufacture of the corrugated pads and liners." (*Id* at 72)

---

In 1994, the employee received a $3,000.00 Packaging bonus; in 2001, an $8,000.00 Packaging bonus, and in 2002, an $8,500.00 Packaging bonus. (Morgan dep. at 73-74)

### G.    A Packaging employee works onsite at Paper at least one day a week

Mr. Morgan admitted that Packaging employee Rose Grabowski works at Paper's Smyrna, Delaware location on a regular basis.  (*Infra* at 5-6) As explained above, Ms. Grabowski provides very important computer installation, training and data input services, litigation management services, and change of location services to the Paper Company.  Yet, the Paper Company pays nothing additional for this significant support from a Packaging Company employee.

### H.    Intermingling of management functions – James Morgan provides administrative and personnel control for both Paper and Packaging

Mr. Morgan's deposition testimony confirmed an intermingling of the management functions between the two companies.  Not only does Mr. Morgan directly participate in Paper personnel management, but Packaging employees likewise are involved.

While Morgan is identified as the Human Resource Director for the Packaging Company[7] (Morgan dep. at 63), he also plays that role for the Paper Company.  Mr. Morgan is responsible for hiring the Paper general manager. While he denied being involved in hiring hourly employees at Paper, he has a role in disciplining hourly employees there  (*Id*. at 58-59) as well as retaining management control by asserting final approval authority for Paper's hourly employees' wages and bonuses. (Morgan dep. at 60-61)

As further example of Morgan's and Packaging employees' input into the personnel management at Paper, he testified that the harassment policy which he issued for the Paper company, after receipt of the EEOC charge related to this litigation, derived from a web site by Ms. Grabowski;

---

While Defendant identified the Paper's General Manager as its Human Resource Director, the facts as set forth throughout this brief reveal that man of those functions are fulfilled by Mr. Morgan or by other Packaging employees.

that he reviewed it and modified it and then signed it as Paper Company policy. (Morgan dep. 128-129)   He admitted that two copies of Paper employee personnel files are maintained; one at the Paper facility and one at the Packaging office.  He had no explanation why this was so. (*Id.* 62)

Mr. Morgan reviews Paper's accounts receivable on a weekly basis and he tells a Packaging employee which of Paper's customers she should contact about delinquent accounts.  (*Id*. at 34) Likewise, he reviews most of the invoices from the Paper Company. (*Id*. at 77)

Paper employees' job descriptions were not prepared by Paper's general manager; rather, they were prepared by a Packaging employee, Rose Grabowski, reviewed and finalized by Mr. Morgan. (*Id*. at 95-96)   Similarly, employment verification forms for Paper employees are handled by Packaging employees.  (*Id.* at 64)   The organizational charts for the Paper and the Packaging companies, produced in the course of this litigation, were prepared by Ms. Grabowski.  (Morgan dep. at 65)

### I.    Paper Company provides Packaging Company warehousing services for which it is not compensated

As discussed above, part of the Packaging Company's business relates to the purchase and resale of new, unused, corrugated cartons.  These are cartons that, for some reason, were unsuitable for their original purpose.  The Packaging Company purchases these in large quantity (by the truck load) and resells them.  During the turnaround time, the cartons must be stored or warehoused. (Morgan dep. at 17-20)  Mr. Morgan explained that this warehousing occurs many places, including at the Paper location. (Morgan dep. at 20)

Of particular relevance is that the Packaging Company does not pay or reimburse the Paper Company for its warehousing service. (Morgan dep. at 22)   At most, Mr. Morgan testified,

Page 9

Packaging may "occasionally" reimburse Paper an "upcharge," which relates to the cost of loading or unloading a trailer of boxes owned by Packaging, but stored in Paper's warehouse. (*Id*. at 22) While attempting to downplay the amount of product that Paper warehouses for Packaging, Morgan admitted that Packaging currently has a customer who requires instant availability of corrugated cartons and, therefore, Packaging must keep a minimum amount of cartons on hand, which are kept at the Paper facility. (Morgan dep. at 99-100) **Morgan admitted that Paper provides this service *gratis* to Packaging.** (*Id*. at 22 )

> **J.    Packaging sells Paper's cartons without Paper realizing a profit on the sale**

Throughout Morgan's deposition, it became abundantly clear that the two companies are not being run at arm-length. Two independently managed companies would not engage in the financial arrangements that are admittedly occurring between these two companies. For example, where the Paper Company has purchased, for resale, new corrugated cartons, those cartons may be sold by Packaging or Paper. (Morgan dep. at 78-84) Morgan admitted that in the event that Packaging sells the cartons owned by Paper, it reimburses Paper nothing more that the actual cost of acquiring the cartons plus shipping and handling reimbursement. (*Id*. at 84) **There is no profit for Paper built into the transaction**. (*Id*. at 81, 83, 84)

When asked why Paper would intentionally operate in such a manner as not to obtain a profit from its venture, Morgan explained that Paper was "providing a service [to Packaging]" (*Id*. at 83-84) That is, Paper purchases a product for resale by itself or Packaging; it warehouses the product until it is resold; and then it permits Packaging to sell Paper's goods, out of Paper's warehouse, without realizing a profit on the sale. Quite a service!

**K.    Packaging runs a part of its business out of the Paper location.  Packaging purchases products manufactured by Paper without affording Paper a profit on the transaction**

In a moment of candor, Mr. Morgan admitted that the Packaging Company runs part of its business out of Paper Company's location.  (Morgan dep. at 89)  Even without that admission, the facts show that Packaging uses Paper's facility and employees to conduct the manufacturing and warehousing part of its business.

With regard to the corrugated pads and liners that the Paper Company manufactures pursuant to the specifications of Packaging employees, Morgan admitted that Packaging pays Paper nothing more than the estimated cost of producing that product.  **There is no profit margin for Paper built into the payment structure for the manufacturing of corrugated pads and liners**.  (Morgan dep. at 85-93, 98)  Essentially, Paper's manufacturing process (corrugated pads and liners) is Packaging's business.  Morgan admitted that the "vast majority" of the corrugated pads and liners manufactured by Paper are to fulfill Packaging customers' orders.  (Morgan dep. 90)

In a lengthy question and answer session (Morgan dep. 75-89), Morgan explained why Paper's general manager is required to keep Packaging accounting department apprized of Paper's "billing, receiving, inventory, payroll hours, repairs, utilities, fuel usage, fork truck usage, end of month reports, maintenance and decisions on repairs of fork lifts/mechanical equipment." (Ap. 138-139)[8]   In a nutshell, Morgan explained that Packaging reimburses Paper on a cost basis for the manufacturing process.  This includes the cost of rent, propane for the fork lifts, electricity and gas heating costs, labor, repair of forklifts and other manufacturing machinery, etc.  The two companies

---

"Ap.__" refers to the Commission's Appendix previously filed in support of its Answering Brief.

determine how much the production of Packaging products costs Paper, in terms of the percentage of Paper's total overhead, and then determine how much Packaging should reimburse Paper in a particular month for those line items. (Morgan dep. at 85-89)    Thus, Paper is reimbursed only for its manufacturing costs associated with making corrugated pads and liners for Packaging customers.

**Again, Morgan admitted the reimbursement arrangement does not factor in a profit for Paper**. (Morgan dep. at 86) The lack of an arm's-length relationship in the business relationship between Packaging Company and Paper Company is revealed by the fact that the business arrangement between the two companies does not include a profit margin for Paper Company.

The fact that Packaging is, *de facto,* running its manufacturing and warehousing business out of Paper's facilities can be seen in language Morgan used during his deposition.  In explaining why Packaging reimburses Paper for maintenance on Paper's machinery, Morgan stated:

> Q.  Now, what brought all this up is:  I asked you
>
> 9   why was one of Gary Eberhard's duties to keep P.T. Morgan
>
> 10   Packaging Company apprised [sic] of repair costs.  That's what
>
> 11   led into this.
>
> 12   A.  Right.
>
> 13   Q.  So tie them together for me if you will.
>
> 14   A.  Okay.  If a particular piece of equipment is
>
> 15   used -- let's go to the extreme -- exclusively to do
>
> 16   something for the Packaging Company and requires
>
> 17   preventive maintenance or there is a breakdown, it would
>
> 18   **not be fair to charge the Paper Company for a repair on**
>
> 19   **equipment that is pretty much exclusively used by the**
>
> 20   **Packaging Company**. ...

(Morgan dep. at 85)    Mr. Morgan essentially admits that the corrugate pad and liner manufacturing portion of Paper's business is, in reality, Packaging's business.

## ARGUMENT

### I.    STATEMENT OF RELEVANT LAW[9]

The sole issue before the Court on these cross-motions is whether P.T. Morgan Paper Company and P.T. Morgan Packaging Company are an integrated enterprise for purposes of Title VII of the Civil Rights Act of 1964.    That is, whether the Commission is able to prove a required element of its claim, that being that the Defendant is an employer as defined by Title VII.

The "integrated enterprise" test was developed by courts to help resolve cases in which a plaintiff attempts to hold two corporations liable as a single employer for violations of a statute prohibiting discrimination in employment. See *Nunez v. Temple Professional Associates, et al.*, 2005 U.S. Dist. LEXIS 2776 *7 (E.D. PA 2005), *citing Gorman v. Imperial Metal & Chemical Co.,* 1999 U.S. Dist. LEXIS 1810 (E.D. PA 1999). The Court's analysis is guided by the Third Circuit Court of Appeals' recent decision in *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72 (3rd Cir. 2003), where the court was faced with the identical issue, although under a significantly different set of facts.

In *Nesbit*, the Court provided a detailed historical explanation of the progression of the courts' analyses of this mixed question of fact and law before setting forth the standard to be applied in this Circuit.    A review of the Court's historical analysis, as follows, is helpful in understanding and applying the test to be used.    As *Nesbit* explained, several courts of appeals have borrowed a

---

[9]    The Statement of Relevant Law is repeated here, *verbatim*, from the Commission's Answering Brief as a courtesy to the Court.

four-part test -- commonly called the "integrated enterprise" test or the "single employer" test --

applied by the National Labor Relations Board ("NLRB") in National Labor Relations Act cases to

determine when two nominally distinct companies should be treated as a single entity under Title

VII.

The four factors of the NLRB test are "(1) interrelation of operations, (2) common

management, (3) centralized control of labor relations, and (4) common ownership or financial

control." *Nesbit*, 347 F.3d at 84 (*citing Artis v. Francis Howell North Band Booester Ass'n, Inc.*,

161 F.3d 1178, 1184 (8th Cir. 1998)).   Among these factors, "no single factor is dispositive; rather,

single employer status under this test 'ultimately depends on all the circumstances of the case.'"

*Pearson v. Component Tech. Corp.*, 247 F.3d 471, 486 (3rd Cir. 2001), *cert. denied,* 534 U.S. 950

(2001) (describing but not adopting the test in a case applying the *Worker Adjustment Retraining*

*Notification Act*) (citation omitted).  As *Nesbit* reiterated, **"The heart of the inquiry is whether**

**there is an absence of an arm's-length relationship among the companies**."  347 F.3d at 84

(emphasis provided) (citing *Knowlton v. Teltrust Phones, Inc.*, 189 F.3d 1177, 1184 (10th  Cir.

1999)).  Moreover, "Courts applying this four-part [NLRB] standard in Title VII and related cases

have focused on the second factor: centralized control of labor relations." *Trevino v. Celanese*

*Corp.*,701 F.2d 397, 403-04 (5th Cir. 1983).

The *Nesbit* discussion continued by noting that while there was surface appeal in applying

the NLRB's test in the Title VII context, given the different policies animating the two statutes, "the

NLRB test does not self-steer to the Title VII context."  *Nesbit*, 347 F.3d at 85.   The Court

acknowledged that a significant purpose of the fifteen-employee minimum in the Title VII context

is to spare small companies the expense of complying with the statute's many-nuanced requirements.

Thus, the Court set forth the following three-part disjunctive test as the way by which a party may prove that a company and its affiliates are a single employer under Title VII: (1) when a company has split itself into entities with less than fifteen employees intending to evade Title VII's reach, or (2) when a parent company has directed the subsidiary's discriminatory act of which the plaintiff is complaining, or (3) the factors courts use to determine when substantively to consolidate two or more entities in the bankruptcy context. *Nesbit* then expounded upon the third test:

> We adopt an intentionally open-ended, equitable inquiry -- which we consider one of federal common law -- to determine when substantively to consolidate two entities. While in the bankruptcy context the inquiry focuses primarily on financial entanglement [footnote omitted], **for Title VII the focus more often rests on the degree of operational entanglement -- whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another**. Relevant operational factors include (1) **the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (*e.g.*, hiring and personnel matters)**, (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) **whether a parent company covers the salaries, expenses**, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other. That is not to say that the considerations showing financial entanglement n9are not relevant in *Title VII* cases; they assuredly are. Indeed, the line between operational and financial may be blurred (*e.g.*, when the third parties dealing with entities as one unit are creditors). However, we assume that financial entanglement will be present less frequently in *Title VII* cases than in bankruptcy cases and will be harder for a *Title VII* plaintiff to prove, given that a typical *Title VII* plaintiff has more limited resources and an attorney who does not specialize in financial transactions. [footnote omitted] Proving extensive financial entanglement will, however, bolster a *Title VII* plaintiff's case.
>
> > n9 Among them are (1) the degree of difficulty in segregating and ascertaining individual assets and liabilities, (2) **the existence of transfers of assets without formal observance of corporate formalities**, (3) **the existence of parent and intercorporate loan guarantees**, (4) whether the subsidiary is

grossly undercapitalized, and (5) the existence of consolidated financial statements.

*Nesbit,* 347 F.3d at 87-88 (emphasis supplied).

In *Nesbit*, the plaintiff failed to produce evidence, other that common ownership, suggesting a substantive consolidation of the two companies. The Court discounted the fact that a joint owner "occasionally participated" in the management of both businesses as proof that the companies did not operate at arm's length. Here, as in *Gonzalez v. Comcast Corporation*, *et al.*, 2004 U.S. Dist. LEXIS 14989 (D. DE 2004)(Jordan, J.), the Commission has shown significantly more cross-over in management between companies to establish the existence of an integrated enterprise as a matter of fact and law.

As the Third Circuit Court of Appeals has explained, "The approach [to determining whether two companies are integrated] is holistic, looking to 'all the circumstances of the case' as opposed to any single, dispositive factor, as was the case under old analyses for piercing the corporate veil[...] *See Ferrell v. Harvard Industries, Inc. et al.*, 2001 U.S. Dist. LEXIS 17358 *70-71 (E.D. PA 2001). The *Ferrell* court also explained that centralized control of labor relations can show integrated management. For example, the fact that one company promulgated joint corporate EEO and harassment policies and exerted influence over the compliance of such policies shows an integrated relationship as a matter of law.

In *Battistone v. Sam Jon Corp.*, 2002 U.S. Dist. LEXIS 19399 (E.D. PA 2002), the Court looked to various factors to supply evidence of a "single employer" or "integrated enterprise," including the sharing of employees and management; the fact that all companies were housed in the same location; that all companies were controlled in part by a member or members of the same

family.  Likewise, in *Bennett v. Picarri Press, Inc.*, 2005 U. S. Dist. LEXIS 1905 (E.D. PA 2005), the Court looked to a variety of factors in determining the nature of the relationship among related companies.  While acknowledging the presumption that a parent is not the employer of its subsidiary employees, the *Bennett* court determined that the presumption was overcome where the parent could control the employment practices and decision of the subsidiary; routinely shifted employees between the two companies; the use of the same work force and business offices for both corporation; and the failure to observe such basic corporate formalities as holding separate shareholder and board meetings.

Generally, the Court must balance the facts and equities of the specific situation presented.  On the one hand, "[A] wrongdoer should not escape liability merely because 'corporate formalities' were observed[.]" *Ferrell,* at *65.  On the other, however, the Court must consider "the fairness of imposing liability for labor infractions where two nominally independent entities do not act under an arm's length relationship." (Internal citations omitted.)  *Id.* at *64 (*citing Pearson v. Component Technology Corp.,* 247 F.3d 471, 486 (3rd Cir. 2001)(internal citations omitted)).

## II.    APPLICATION OF THE FACTS TO THE LAW

**"The heart of the inquiry is whether there is an absence
of an arm's-length relationship among the companies**."

The law of this Circuit, as explained above, recognizes that the issue before the Court is one of federal common law.   The heart of the inquiry is whether the Paper and Packaging Companies are being run at arm's-length.  That is, looking at "all the circumstances of the case", do the facts, if believed, support a conclusion that the two companies are essentially being run as one.  The focus

Page 17

of the inquiry, for Title VII purposes, rests on the degree of operational entanglement of the companies. As stated in *Nesbit*,

> [F]or Title VII the focus more often rests on the degree of operational entanglement -- whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another. Relevant operational factors include (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (*e.g.*, hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other. That is not to say that the considerations showing financial entanglement n9 are not relevant in *Title VII* cases; they assuredly are. Indeed, the line between operational and financial may be blurred (*e.g.*, when the third parties dealing with entities as one unit are creditors). However, we assume that financial entanglement will be present less frequently in *Title VII* cases than in bankruptcy cases and will be harder for a *Title VII* plaintiff to prove, given that a typical *Title VII* plaintiff has more limited resources and an attorney who does not specialize in financial transactions. [footnote omitted] Proving extensive financial entanglement will, however, bolster a *Title VII* plaintiff's case.

> > n9 Among them are (1) the degree of difficulty in segregating and ascertaining individual assets and liabilities, (2) the existence of transfers of assets without formal observance of corporate formalities, (3) the existence of parent and intercorporate loan guarantees, (4) whether the subsidiary is grossly undercapitalized, and (5) the existence of consolidated financial statements.

*Nesbit,* 347 F.3d at 87-88.

A review of the complete transcript of Mr. Morgan's testimony leads to the inescapable conclusion that the Packaging and the Paper companies are being run by their owners who are also the sole board of directors members, Mr. and Mrs. Morgan, as a united entity. While the Morgans have attempted to cover up the true nature of the companies' relationship by maintaining the appearance of separation through separate incorporation, the Court must look beneath the surface to discover the true story. Several general factual categories establish the intermingling of these companies. They are: the joint ownership and management of the companies including Mr.

Page 18

Morgan's multiple roles in managing both companies; the extensive human resource management, administrative and accounting services provided by Packaging employees to operate the Paper Company; and the financial arrangements between the companies whereby the Paper Company provides products and services to the Packaging Company without realizing a profit.

It is undisputed that the two companies are jointly owned by Mr. and Mrs. Morgan, and they are managed by the same two individuals as the sole members of the boards of directors.  Mr. Morgan, the acknowledged Human Resources Director of the Packaging Company,  admitted that he retains final authority over  wages and bonuses for Paper Company employees and he has authority to discipline Paper employees.

Although Paper contends that it's General Manager acts as its Human Resources Director, Morgan admitted that a Packaging employee, with his  final approval, created the job descriptions for Paper employees, including its General Manager.   Morgan admittedly is the hands-on top person for the Packaging Company. (Morgan dep. 63)  Likewise, his imprint on the regular operation of the Paper Company is evident.  Morgan reviews Paper's financial records at least weekly; he directs a Packaging employee to contact delinquent Paper accounts.  Morgan has final approval authority for Paper employees' wages and bonuses, including hourly workers.  Likewise, he occasionally asserts disciplinary authority over Paper employees.

The Paper company does not employ an administrative or accounting staff.[10]  Rather, as stated at length above,  the companies are arranged so that the majority of the administrative and accounting functions required to run the Paper business are kept in the Packaging offices and are

---

The Paper Company's identified employees include only one general manager and several laborers.

performed by Packaging employees.    These functions include the primary financial functions involved in running the business: invoicing accounts; maintaining accounts receivable ledgers; receiving and depositing payments from Paper customers; preparing financial statements; interacting with the CPA who prepares tax returns for both companies.  Packaging employees maintain payroll records and transmit that information to an external payroll company; they also interact with that company when Paper employees have problems.  Packaging employees provide other administrative services  when they interact with third parties who provide services for Paper employees, including the payroll service, worker's compensation carriers, health insurance providers, and others.

Packaging employees, with Morgan's final approval, also provide essential human resource managerial functions such as preparing Paper employees' job descriptions and drafting a company anti-harassment policy and maintaining a personnel files for Paper employees.

Significantly, Packaging employee Grabowski spends a great deal of time (estimated by Morgan as 20% of her time) at the Paper facility engaging in functions essential to that business. Because of problems in maintaining control of Paper's inventory, she installed a new computer system, trained Paper's general manager on the system, inputted an undisclosed amount of data on the system.  She also has acted as Paper's point person with the contractor employed to construct Paper's new facility and to interact with the municipality regarding construction issues.  She acts on Paper's behalf by compiling information and collecting documents relevant to this litigation.  Yet, Paper pays Packaging nothing extra for these important services.

Finally, the financial arrangements between the Packaging and Paper companies provides a blatant  example of the lack of "arm's-length" dealing in their management.  Morgan admitted that Packaging uses the Paper facility to produce a product for its customers without reimbursing Paper

at a rate that affords Paper a profit margin.    Rather than setting a price for the products that Paper produces to sell to Packaging, the companies attempt to determine the actual cost of producing pads and liners for Packaging customers.  Then, Packaging pays Paper no more than its actual cost.

It is reasonable to assume that no independently managed company would manufacture and sell a product on that basis.  It is reasonable to assume that no independently managed company would open its financial records to another and agree to be paid simply its bottom line production costs as determined on a monthly basis.  Independently run companies would negotiate a price for a product.   An independently run manufacturing company would set a price for its goods which would include some profit margin.   The Paper and Packaging companies have a financial relationship that clearly reveals that, in essence, the corrugated pad and liner production aspect of the Paper business is run simply to produce a product for Packaging's customers, which Packaging "purchases" at cost.

Similarly, Morgan admitted that Packaging uses the Paper facility to warehouse its goods without reimbursing Paper for the warehousing service.   Again, it is difficult to imagine an independently run company that would warehouse goods for another company without charging a fee for that service.

While Defendant has charged the Commission with being overbearing and of taking advantage of a "little" company, it appears that Defendant has not acted with clean hands in filing its Motion for Summary Judgment or in continuing to assert this frivolous defense.  Defendant complains of the financial burden it has endured in defending this lawsuit.  Yet, clearly its expenses

have only grown as a result of pursuing a baseless defense.[11]  The Commission would respectfully

ask that the Court instruct Defendant to "do what is right, not just win."

---

In the event that the Court denies Defendant's motion for summary judgment but does not rule dispositively in the Commission's favor, the Commission will be forced to engage in extensive additional discovery regarding Paper's and Package's customer lists; contracts; sales force; billing and collections; etc.

<u>CONCLUSION</u>

The Plaintiff requests that this Honorable Court find, as a matter of fact and law, that P.T.

Morgan Paper Company and P.T. Morgan Packaging Company compose an integrated enterprise for

purposes of Title VII and this litigation.   Plaintiff respectfully requests this Honorable Court to grant

the Commission's Cross-Motion for Summary Judgment.

In the alternative, viewing the evidence and drawing all reasonable inferences in the

Commission's favor, it is clear that genuine issues of material fact exist in this case sufficient to

defeat the Defendant's motion. And Plaintiff respectfully asks this Honorable Court to deny

Defendant's Motion for Summary Judgment.

Respectfully submitted,

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Jacqueline H. McNair
Regional Attorney

Judith O'Boyle
Supervisory Trial Attorney

  /s/ M. Jean Clickner
M. Jean Clickner
Senior Trial Attorney
Equal Employment Opportunity Commission
Liberty Center, Suite 300
1001 Liberty Avenue
Pittsburgh, PA 15222
(412) 644-6439

**Local Counsel:**
**UNITED STATES ATTORNEY**
**DISTRICT OF DELAWARE**

  /s/ Seth M. Beausang
Seth M. Beausang
Asst. U.S. Attorney
The Nemours Building
1007 Orange Street, Suite 700
Wilmington, Delaware 19899
Del. Bar ID No. 4071
(302) 573-6277
**Attorneys for Plaintiff**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **EQUAL EMPLOYMENT** | ) |
| **OPPORTUNITY COMMISSION,** | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Civil Action No. 04-1304** |
| | )   **Judge Kent A. Jordan** |
| | ) |
| **P.T. MORGAN PAPER COMPANY, an** | ) |
| **affiliate of P.T. MORGAN PACKAGING** | ) |
| **COMPANY,** | ) |
| Defendant. | ) |

**CERTIFICATE OF SERVICE**

   I, Seth M. Beausang, counsel for Plaintiff, hereby certify that on this 2nd day of February, 2006, a correct copy of the foregoing Commission's Supplement to Answering Brief in Opposition to Defendant's Motion for Summary Judgment and Brief in Support of Commission's Cross-Motion for Summary Judgment was served by electronic filing:

      Thomas S. Neuberger and
      Steven J. Neuberger
      Two East Seventh St., Suite 302
      Wilmington, DE 19801-3725
      Attorneys for Defendant

     /s/Seth M. Beausang        
     SETH M. BEAUSANG
     Assistant U.S. Attorney