1    put into the computer.  And we know how long it takes to

2    band.  So all you do is input the size of the pad and it

3    will give you the cost per thousand.  If it's $20 for

4    1,000, and there is 100,000 pads, it's $2,000.

5          So he's been reimbursed for the material,

6    reimbursed for the labor, reimbursed for the twine,

7    plastic and shrink wrap.  But if he doesn't run them as

8    fast as he should for whatever reason, he's only going to

9    be paid the standard costing.  If he beats the estimate,

10    it goes to the Paper Company's profit.  If it cost him

11    $1,700 and the estimate was 2,000, $300 goes to the Paper

12    Company.

13          We try to be as accurate as we can.  I know

14    the case that you are trying to prove.  But that is

15    exactly why the two companies were organized the way they

16    are.  They are separate.  They have separate costing

17    systems.  Paper Company is losing money and the Packaging

18    Company is making money.  If you were the owner, you

19    would want to know how much the Paper Company is making

20    or losing.  You dump it all together and you don't know

21    where you are.  You know what the bottom number is, but

22    who's making the money and who isn't?

23    Q.   So if say, for example, if the Paper Company buys

24    seconds and they aren't sold, the loss then goes to the

James Morgan          94

1  Paper Company; is that correct?

2    A.  They're basically, it's either sold or baled.

3  We -- I didn't agree with the general manager's decision,

4  but we once bought and still have some quarter of a

5  million Mountaire poultry lids, white and red and blue

6  printing.  We bought them for $20 a thousand.  And he is

7  selling them to fish people, even though it says poultry,

8  at $300 a thousand.  But I would have never, ever myself

9  taken eight loads of something that's going to take you

10  three years to get rid of.

11         So it's either cut into pads -- we also make

12  what's called tree liners.  Nurseries right about this

13  time of the year are, I guess, planting small seedlings.

14  And I never knew it, but deer love to nibble on those.

15  So we run some of the material out of wax coated board,

16  which will withstand rain and snow.  It won't come apart.

17  And they will put these around, I guess, maybe up to 24,

18  30 inches high on the small part of the tree.  So it's

19  either going to be sold or baled or cut into something.

20  We have customers that will take pad that says Perdue.

21  They don't care.  Perdue does.

22    Q.  But if paper buys seconds, boxes, for example --

23    A.  We are talking about these big boxes?

24    Q.  Yeah.  -- and they are not sold --

                James Morgan              95


1    A.  But they get sold.  I won't say it's an elastic

2   market.  It's a very good market right now because of the

3   high cost of petroleum.  So we get calls -- I say we,

4   Paper Company, Packaging, will get a call out of the

5   blind, hi, do you handle bolt boxes?  Yes.  Now you have

6   to describe them.  I say, where did you get our name?

7   From so and so.  So our name gets handed around.  I would

8   say we are the largest supplier of second big boxes and

9   second poultry and fish boxes.

10          (Morgan Deposition Exhibit No. 4, Job

11   Description, was marked for identification.)

12          THE WITNESS:  Could I ask a question?

13          MS. CLICKNER:  That's rather unorthodox.

14          MR. NEUBERGER:  Do you need a break?

15          THE WITNESS:  No.

16          MR. NEUBERGER:  Let's move on.

17   BY MS. CLICKNER:

18    Q.  Can you identify Exhibit 4?  What is this

19   document?

20    A.  It's a job description of a general manager.

21    Q.  For the Paper Company?

22    A.  Correct.

23    Q.  Who created this?  Do you know?

24    A.  I believe at Tom's urging in the past year or so,


                James Morgan              96


1   we decided that we were going to have a job description

2   for everybody.  So this task was delegated to Rose

3   Grabowski who, in discussions with Gary Eberhard and then

4   submitted to me for additions and deletions, I approved

5   all the job descriptions.

6      Q.   Now let me back up.  I'm still trying to

7   understand the relationship between Packaging and Paper.

8      A.   I know it's difficult because it's two different

9   companies.  But we overlap.  We provide services, but

10  they are separate, really separate organizations.  But

11  they do business back and forth.

12     Q.   So the pads that are created at the Paper Company

13  for the Packaging Company are created only per

14  specification per order from the Packaging Company; is

15  that correct?

16     A.   Yes.  Because they are being sold to somebody

17  where that pad has to fit in the box.  And the best

18  example I can use is about 10 years ago when there was a

19  paper shortage, we were getting calls from people we

20  don't even know for pads.  You look at the back of a

21  photo.  What do you call them?  Picture frame.  Picture

22  frames always use -- this is chip board.  You see dirt,

23  all the dirt and whatnot in it.  Chip board was in short

24  supply.  So they went to corrugated, which is more

                    James Morgan              97


1   expensive.  But if you have a picture frame that's 12 by

2   12, you've got to make it 12 by 12.  Otherwise, it won't

3   fit.

4          So we have a number of customers where they

5     are repeat orders, once a month, twice a month.  So that

6     most orders are run from a specific purchase order.

7     Either somebody issued a purchase order to the Paper

8     Company or somebody issued a purchase order to the

9     Packaging Company.  If it was issued to the Packaging

10     Company, it will in turn issue a purchase order to the

11     Paper Company with all of the data, the costs, the

12     delivery date, how to stack it, et cetera.

13          But we sell some people, we sell four

14     different people that sell 30 dozen egg cartons.  So we

15     are constantly getting orders.  So at times -- we've

16     never run out of work; although, somebody in one of the

17     reports said we ran out of work.  I don't think we ran

18     out of work in about six or eight years.  So if there is

19     no order, then they'll run for inventory knowing that we

20     will be getting an order.  But it will be a specific

21     size.

22     Q.   When Packaging has an order for pads, it goes to

23     Paper and invoices paper for an order.  Not invoices.

24     Excuse me.


          James Morgan              98


1     A.   A purchase order.  We issue -- Packaging issues a

2     purchase order.

3     Q.   Is Paper paid for that final product in any

4     amount in addition to this reimbursement for labor costs,

5  overhead, fuel, machinery?

6  A.  No.

7  Q.  So, basically, Packaging is only paying Paper the

8  cost of producing, its cost of producing that product?

9  A.  We refer to that as the direct cost.  You

10  wouldn't have that cost if you didn't have the pad.  So

11  that's why it's got material, labor, et cetera.

12  Q.  So there is no profitability into that sale for

13  the Paper Company?

14  A.  That is correct.  Just as if Paper Company sold a

15  truckload of those big boxes, Packaging Company wouldn't

16  get anything.

17  Q.  Boxes that Paper Company has purchased.

18  A.  Correct.

19  Q.  But not boxes that the Packaging Company has

20  purchased.

21  A.  We don't really buy very many boxes that go into

22  the Paper Company.  He's the guy that gets a phone call.

23  Like yesterday, we have two trailer loads from

24  International Paper.  They are in route to you.  He


            James Morgan                99


1  unloads them, puts them in inventory.  You've got another

2  trailer at Weyerhaeuser.  Your trailer is full.  Come and

3  get it and drop and empty.

4  Q.  Those are Paper purchases, those products?

5  A.  Yes.

6    Q.  And if they sold by Packaging, Paper does not

7    make a profit on them?

8    A.  That is correct.

9    Q.  Is Paper reimbursed for its cost of warehousing

10   those products prior to Packaging selling them?

11       MR. NEUBERGER:  Prior to the sale?

12   Q.  Yes.

13   A.  No, because the items that are warehoused are

14   really items like these big boxes and the wax boxes that

15   are generic and can be sold by either company.  Now, at

16   the end of December, there was $13,000 of Packaging

17   Company boxes in inventory.  And that's only because our

18   largest count requires warehousing.  If you do business

19   with the plastic companies, they can run 24 hours a day,

20   7 days a week.  And they can ship by bulk rail, bulk

21   truck, boxes, bags.  So they take an order on Thursday

22   afternoon.  They are going to run it on Sunday.  You get

23   an order to have boxes there the next day.  As part of

24   doing business with them, you must carry, in this


James Morgan              100


1    particular case, one load of brand new boxes.

2    Q.  So you are saying Packaging's largest account

3    requires warehousing because that account requires

4    instant availability?

5    A.  Because they will change our schedule.  Now, we

6    have another account, not quite as large, where we have

7   been able to get our vendor to warehouse.  Nobody likes

8   to warehouse.  You don't get paid for it.  You've got

9   damage, obsolescence, et cetera.

10      Q.  I'm going to show you a document that will be

11   marked Exhibit 5.

12          (Morgan Deposition Exhibit No. 5, Schedule

13   K-1, was marked for identification.)

14          THE WITNESS:  I might add about Packaging,

15   Paper, in five prior years, I've worked for some pretty

16   good sized companies.  I don't know that you've ever

17   heard of Mead, but they are a huge company.  They got out

18   of boxes now.  Smart.  But if a plant in Cincinnati had a

19   branch plant of Procter & Gamble in their backyard, PG

20   happens to be in Cincinnati headquarters, but there is a

21   plant in Milwaukee, if there is a P&G plant in Milwaukee,

22   they will make like a national contract.  You've got 10

23   locations.  We've got 10 plants.  And the profit on the

24   order goes to national accounts.  The local plant has to


                    James Morgan            101


1   transfer at its cost.  That's not uncommon.

2          MS. CLICKNER:  I will just move to strike

3   everything he said, this last business, because it's

4   unresponsive to any question and really irrelevant to

5   what is at stake here, but --

6   BY MS. CLICKNER:

7      Q.  Let's look at Exhibit 5.

8          MR. NEUBERGER:  For the record, counsel,

9    this has his Social Security number on it.  I don't think

10   this was in my appendix.  I know he had tax stuff in

11   there, but this is a K-1 Schedule.

12          MS. CLICKNER:  Do you have a black marker?

13   You can just black it out.

14          MR. NEUBERGER:  And on the second page, too,

15   right below the word "confidential," do you see it there?

16   I think that's it, counsel.  Thank you.

17   BY MS. CLICKNER:

18   Q.  Can you identify this for the record?

19   A.  Yes.

20   Q.  What is it?

21   A.  Shareholder's share of income, credits,

22   deductions, et cetera.

23   Q.  Where are you reading?

24   A.  At the top, very top in the center.


                James Morgan              102


1    Q.  We have different --

2    A.  It's a Schedule K-1.

3          MR. NEUBERGER:  This is 2002.

4          MS. CLICKNER:  This is 2002 also but I have

5    a tax return.

6          MR. NEUBERGER:  Why don't you work off of

7    this one and I will share this one?

8          MS. CLICKNER:  That's fine.  I was going to

9    ask about the tax return for the Paper Company.  That's

10   not the issue.

11            (Thereupon, a discussion was had off the

12   record.)

13            (Thereupon, a short recess was had.)

14   BY MS. CLICKNER:

15     Q.  Mr. Morgan, can you identify this Exhibit 5?

16     A.  U.S Income Tax Return for an S Corporation.

17     Q.  And that's for P.T. Morgan Paper Company?

18     A.  Yes.

19            MR. NEUBERGER:  I'm sorry.  We remarked it?

20   Let's just change this to a 5 and keep the 5 the way it

21   was.

22            MS. CLICKNER:  That's fine.  This will be 6.

23            (Morgan Deposition Exhibit No. 6, Tax Return

24   for S Corporation, was marked for identification.)


                    James Morgan              103


1             MR. NEUBERGER:  For the record, this is

2    Pages 157 through 162 since I don't have a copy.

3    BY MS. CLICKNER:

4      Q.  Is this an annual return or a quarterly return?

5    Can you tell?

6      A.  Looking at the numbers, it's annually.

7      Q.  And do you approve the tax returns before they

8    are submitted to the IRS?

9      A.  I sign them.  But as you can see, they're done by

10    a CPA.  I look at the numbers, but I don't study them.

11    Let's put it that way.

12        Q.   Can you tell me on here where it reflects the

13    cost that P.T. Morgan Paper Company pays the Packaging

14    Company for the administrative services, what line item

15    would that be in?  Do you know?

16        A.   I think it's under fixed cost.  I would have to

17    say I don't see it.  I know it's on the financial

18    statements.  But, obviously, this is the first time I've

19    ever checked it.  I will make the assumption that it's

20    incorporated in some other line item.

21        Q.   But you don't know where; is that right?

22        A.   I honestly don't.

23        Q.   Do either of the companies, P.T. Morgan Paper or

24    P.T. Morgan Packaging obtain any sort of tax benefits for

                    James Morgan            104

1     being a small business?

2         A.   No, not that I can think of.  At one time we used

3     to get waste out of Dover Air Force Base, but not

4     anymore.  And we used to sell some boxes to the U.S.

5     House of Representatives.

6              MR. NEUBERGER:  They buy trash?

7              THE WITNESS:  No, they were new.

8     BY MS. CLICKNER:

9         Q.   Do you have any tax benefits for being a small

10    business?

11    A.  Not that I'm aware of.

12    Q.  At any time during the existence of the two

13    companies, has the Packaging Company and the Paper

14    Company taken out joint loans?

15    A.  By joint, what are you referring to?

16    Q.  Both would be debtors on the same loan, both

17    companies would be debtors on the same loan.

18    A.  I would say maybe a few times.

19    Q.  Do you recall when?

20    A.  That's a little difficult to answer that one only

21    because our original bank was Maryland National Bank, who

22    in the '90s went under.  Actually, they started at MBNA

23    here.  And it became Nations Bank.  And then a couple

24    years ago, Nations Bank merged with Bank of America.  So


                James Morgan            105


1    Bank of America is who we have now.

2            So from the days of almost a handshake to

3    get a loan in the '80s, they were constantly changing the

4    loan papers.  But it used to be, at one time, that

5    Packaging guaranteed the Paper Company.  At least I

6    believe so.  I don't know how -- I guess maybe in

7    researching some, that we were checking on -- could have

8    been some information that you requested about a week

9    ago.  I was looking to see when the loans expired.  On

10   the line of credit where we don't have to repay every

11   year, all we do is pay interest.  And I believe that the

12    latest is that the Paper Company, of all things, is

13    guaranteeing the Packaging loan.

14    Q.  Currently are you saying?

15    A.  I think so.  I really, it's a question that I

16    really don't like to answer because I'd rather not -- I'd

17    rather say I don't know than give wrong information.  And

18    you've probably seen it that my wife and I have

19    guaranteed all the bank loans.

20    Q.  What is the benefit for one company to, to one

21    company, say to the Packaging Company, to guarantee a

22    loan for the Paper Company?

23    A.  Say it again.

24    Q.  What would be the benefit to the Packaging


                    James Morgan              106


1    Company to take on that responsibility for guaranteeing a

2    Paper Company loan?

3    A.  It could have been you either do it or the Paper

4    Company doesn't get the loan.  Nobody likes to guarantee

5    a loan.  I'm not happy that we're guaranteeing.  But if

6    you are strictly a small business in dealing with Bank of

7    America, they don't even know who you are.

8    Q.  So are you saying there is no benefit to

9    Packaging Company to guaranteeing the loan of the Paper

10    Company?

11    A.  Only if that was a requirement for the bank to

12    make the loan.  If the bank said we're not going to give

13    this line of credit of $100,000 to the Paper Company

14    unless the Packaging Company guarantees it, obviously, we

15    would guarantee it.

16       Q.   It's not obvious to me why you would guarantee

17    it.  So that's what I would like you to explain on the

18    record.

19       A.   My wife and I, a few years ago, used to make a

20    lot of money in the Paper Company.  And if somebody said

21    you either guarantee that loan or we are not going to

22    loan you, it would be silly to cut off our nose to spite

23    ourselves.  Financial conditions of our companies right

24    now are not what they were in 2002.


                    James Morgan              107


1     Q.   Okay.

2     A.   I mean the bank put it in there.  And we could

3    have said, well, we are not going to sign it.  They would

4    say thanks and good-bye.

5     Q.   So it is you and your wife's decision to use the

6    assets of the Packaging Company to guarantee the Paper

7    Company; is that correct?

8     A.   Yes.  I would say so.  And don't forget that

9    we're the ultimate guarantor of all the loans.

10    Q.   So it's your decision to use the assets of one

11    company to maintain the business, the profitability of

12    the other company?

13    A.   Well, there is also the intercompany business

14    that we talked so long about.

15    Q.  Do you know -- have you met each of the

16    complainants in this case, who are Anthony Moore, Patrick

17    Moore, Carlyle Moore and Bernard Tingle?

18    A.  I don't know that I have shook hands with each of

19    them.  And aside from Anthony Moore, I know everybody

20    else.  Now, I don't know if I passed Anthony Moore by

21    himself on the sidewalk that I would recognize him.  But

22    the others that would be a very good chance.

23    Q.  That you would recognize them if you saw them out

24    of context?


                James Morgan            108


1    A.  Yes.  And I'm getting over to the Paper Company

2    more often than I used to, number one, the profitability

3    of the company with a new manager.  Number two, because

4    of the EEOC and the move and also the problems that those

5    four people have created for us.  Now, I don't discipline

6    anybody directly.  But I, nowadays, know what they are

7    doing.  And if you check your letters, you know what they

8    are doing.

9    Q.  Well, let me ask you this: Has any of these four

10    men ever spoken to you to complain about any kind of

11    harassment?

12    A.  Never.

13    Q.  Have any of these four men ever spoken with you

14    one on one ever?

15    A.  No.  No one has asked to.  I have spoken to the

16    other people, but, you know, not about the job they are

17    doing or what.  We've got some employees that go back to

18    the first day that we opened the door.

19    Q.  Have --

20    A.  I will tell you that I have gotten a phone call,

21    two phone calls from an employee other than the people

22    that you've mentioned.  And I do get phone calls from the

23    team leader where he's looking for instructions on how to

24    load a trailer or something.  I'm more apt to talk with

James Morgan            109

1    him, Jerry Broussard, than anybody else.

2    Q.  And is that a recent turn of events or has that

3    always been the case, that you receive phone calls

4    directly from employees?

5    A.  Well, recent other than Jerry Broussard.

6    Q.  Let's back up.  Who have you received phone calls

7    from, what employees at the Paper plant?

8    A.  Aaron Walls, probably Goodermuth, but not

9    recently in as much as Jerry Broussard is the team

10   leader.

11   Q.  When did Aaron Walls call you?

12   A.  He's called twice.  Once.

13        MR. NEUBERGER:  Excuse me.  Was there a time

14   frame or are you saying ever?

15        MS. CLICKNER:  I'm starting with ever and

16    then we will get more recent.  I want to know if this is

17    going back to the '80s, '90s.

18          MR. NEUBERGER:  I just want to understand.

19    Your question is have any of the employees of Paper ever

20    called you directly?

21          MS. CLICKNER:  Yes.

22          THE WITNESS:  Aaron, I'm guessing, about

23    maybe two months ago.  He had worked for us, I think this

24    is the third time now.  But he was engaged to get


                James Morgan                110


1     married.  And he had walked off the job and lost his job.

2     But the lady he was engaged to was working for us on the

3     pad operation.  And he called me and said, Mr. Morgan, is

4     there any possibility I can get my job back?  And he said

5     my wife needs to go back to school to get her degree.

6     I'm assuming high school.  And I need a job so that she

7     can go back to school.  So I only talked to him one time.

8     Although, he called me a couple times.  But I'm,

9     unfortunately, not readily available with everything

10    that's on the table right now.

11          So I try, as I've mentioned before, to use a

12    chain of command.  I don't criticize people in front of

13    other people.  And it really was not my decision whether

14    to take Aaron Walls back or not.  That was the general

15    manager's.

16          So I called the general manager and I said

17    Aaron Walls called me.  And I told him why he wanted to

18    come back to work.  I said, Gary, that's your decision.

19    I'm never happy with people that walk off the job or do

20    other things that are not kosher.  So I didn't give Gary

21    any instructions.  And he hired him back.

22         Then as the continuing problem that exists

23    with some employees, Aaron Walls almost came to

24    fisticuffs with --  Aaron Walls happens to be white.


             James Morgan          111


1    Some of the people I can remember their names.

2    BY MS. CLICKNER:

3      Q.  You should have a list here.

4      A.   Yeah.  There is Jennifer Walls on there, Bernard

5    Tingle.  About a week to 10 days ago, the team leader

6    needed some help on the balers.  And the way it was told

7    to me by Aaron was that he volunteered to go back and

8    work on the baler.  And when he got back there, the

9    vulgarity spewed out of Bernard Tingle's mouth like a lot

10    of other people that we have.  And it almost came to

11    fisticuffs.

12         Both of those employees were suspended for

13    the day.  I got a call from Aaron Walls and he said,

14    Mr. Morgan, I just want to tell you, I didn't start that.

15    They, who I won't identify, feel that I've filled Gary in

16    on the problem with Carlyle Moore and the other Moore

17    boy, who Carlyle was listening to the Ipod.  You've got a

18    copy of that letter so you know what happened.  So they

19    figured that Aaron told Gary about it.  And --

20    Q.  Is this recent?

21         MR. NEUBERGER:  Wait a second.  I don't

22    think she has a copy of any letters of things you've

23    given me.  You're proceeding on assumption here.  She's

24    asked me to look into some things and I've done that.


                    James Morgan            112


1    You gave me letters.  I'm your lawyer.  She can ask you

2    whatever she wants about any incidents.  I haven't

3    necessarily turned anything over to her at this time.  So

4    you are under a misconception here.

5         THE WITNESS:  Just from one of her letters,

6    it sounded like she got a phone call the next day.

7         MR. NEUBERGER:  That's fine.  She can ask

8    you about where you found out about it.

9         THE WITNESS:  So I said, well, Aaron, that's

10   a decision that Gary has made.  We are not going to have

11   any kind of fighting.  And, yeah, he may have called you

12   some names that he shouldn't have and threatened you.

13   But what is done is done.  And Gary has made the

14   decision.

15        And the only other employee recently would

16   have been Jerry Broussard.  But he, generally, is calling

17   for specific instructions of what to do next or how to

18   load this trailer, the jump we got on a trailer.  But he,

19    generally, adds on some comments about when something is

20    going to be done over here.

21    BY MS. CLICKNER:

22       Q.   What do you mean by that?

23       A.   Well, all I can say is too bad you don't have

24    some of the letters.  Would you allow an employee to be


            James Morgan            113


1    late 17 times in 30 days?  Would you allow -- I can't

2    think of his -- Patrick Moore yesterday was disciplined

3    and walked off the job.  Generally, you get terminated

4    for that.  Those are the kind of antics that are

5    occurring for the people you are representing.  And those

6    are the only phone calls.

7       Q.   So is it your testimony that, for example, in

8    2002 and 2003, no employees from the Paper Company called

9    you for any reason?

10      A.   Not really.  If they did, it would have been

11    either Jerry or Doug Goodermuth.  Not complaining about

12    people but asking how to solve this problem, whatever it

13    was.

14            But anybody can stop me any time I walk

15    through the plant.  We held a Christmas luncheon right

16    before the holidays.  And all the employees except one

17    showed up.  I take that back.  They all showed up.  The

18    one guy showed up, hadn't been to work in the morning.

19    And after lunch, he didn't come to work then.

20          So there has been opportunities.  I like to

21    use the phrase "an open door policy."  Somebody can stop

22    me.  They can call me on the phone.  They may get an

23    answer that they don't like.  But I can be approached.

24    Q.   Is it your understanding that your telephone


                    James Morgan              114


1    number in Maryland was easily accessible to all employees

2    at the Paper Company?

3    A.   The company number is always -- I won't say

4    always but during working hours.

5    Q.   But how would Paper employees know what the

6    company number was, where you could be reached?

7    A.   I can't answer for the whole group of people,

8    but, certainly, Jerry Broussard, Doug Goodermuth, perhaps

9    Roy James.  I don't know if the Packaging Company number

10    is posted.  But they could certainly ask somebody or call

11    information.

12    Q.   Is it your testimony that if an employee had a

13    claim of harassment say in 2003, that it was proper and

14    acceptable for them to call you rather than go, for

15    example, to Gary Eberhard?

16    A.   I would say, again, you would go up the chain of

17    command.  If you have a complaint, then it should be

18    voiced to the team leader.  If it's not handled to your

19    satisfaction, then you can go to the general manager.

20    And if it's not handled satisfactorily, it would come to

21  me.

22      Q.  Now, that's your opinion.  Were the employees at

23  the Paper Company ever told that process?

24      A.  I would think not, but they would certainly know

                    James Morgan                115

1  to go to the general manager.

2      Q.  That wasn't my question.  My question is:  Would

3  they know to go to you?

4      A.  Some would and some would not.

5      Q.  And correct me if I'm wrong, but it's your

6  testimony that the proper, they should go through the

7  chain of command before going to you; is that correct?

8      A.  Yes.

9      Q.  But that was not written anywhere or there is no

10  poster saying that?

11      A.  Uh-uh.

12      Q.  Is there a poster today telling people what to do

13  if they have a claim of harassment?

14      A.  I personally do not know.  I know that

15  immediately after the incident there were posters that

16  went up.  But, unfortunately, there are some people that

17  work for us that tear things down and pull the UPS labels

18  off of boxes.  So I don't know whether there is a poster

19  there today.

20      Q.  Well, what do you mean when you say the incident?

21  What are you referring to?

22     A.   You would have to describe in what context.

23     Q.   You just used the term, I know that after the

24     incident posters were put up.


                    James Morgan                116


1     A.   Oh, the charge of racial harassment that was made

2     and served on us by Mark Maddox.

3     Q.   The EEOC charge?

4     A.   It was the day, I believe, that he came down to

5     talk with the employees that were involved and he had a

6     meeting with individual employees.  He had a meeting with

7     Doug Goodermuth and myself and Gary Eberhard.  Then I

8     believe that the meeting continued with just the three of

9     us.

10     Q.   Let's back up.

11     A.   So subsequent to that, there was a meeting held

12     with employees and, I believe, posted on the bulletin

13     board -- actually, there were two meetings with employees

14     that that type of harassment would not be tolerated.

15     Doug Goodermuth was told if it ever happens again, he

16     would be discharged.

17          Then just last week, someone started talking

18     about harassment because Doug Goodermuth supposedly

19     whistled Dixie.  But he can't whistle.

20     Q.   The charge of harassment relates to two things, a

21     general racially hostile environment and an incident

22     where Doug Goodermuth allegedly showed Anthony Moore a

23   nigger application.  Is that correct, is that how you

24   understand it?

                    James Morgan              117

1     A.  Yes.

2     Q.  Do you know when the nigger application incident

3   occurred?

4     A.  I can't give you the exact day.  But it would be,

5   I'm guessing, May to June of probably '94.

6     Q.   '94?

7     A.  2004.

8     Q.  I think the evidence of record and in the charge

9   is that the incident happened in November of 2003.  And

10   Mr. Anthony Moore quit working in February 2004.

11     A.  You are probably correct.  It did not get known

12   to me until it was warm in 2004, May, June, somewhere

13   around there.

14     Q.  So it's your testimony you didn't even hear about

15   the incident until you received a copy of the EEOC

16   charge; is that correct?

17     A.  I don't know whether I got a phone call -- I

18   believe I got a phone call first from Mark Maddox.  And

19   then, perhaps, was given the papers at the meeting that

20   we had with him or right after the phone call maybe

21   before the meeting.  I'm pretty sure that my first

22   knowledge of it was a phone call.  Then I contacted Gary

23   Eberhard immediately.

24　Q.　And what did Mr. Eberhard tell you?


James Morgan　　　　118


1　A.　He said I had Anthony in the office and I said

2　are you okay.　He said throw it way.　Crumple it up and

3　throw it away.　Are you okay with it?　He asked him

4　twice, I think.　Are you okay with it?　And I would have

5　surmised that he said yes because he left the office.

6　Q.　Were you surprised that Mr. Eberhard had not told

7　you about that incident prior to your notice from the

8　EEOC?

9　A.　I will say kind of yes and no.　I have been a

10　production manager myself.　And I know that incidents

11　occur and that's the end of it.　Inasmuch as the guy had

12　a meeting with the general manager and, apparently,

13　indicated that he was okay, and then the guy quit in

14　November.　I guess if I were in those shoes, I'd guess it

15　passed over.

16　　　　MR. NEUBERGER:　What did you say?

17　A.　Passed over.　I mean, it occurred.　We had a

18　meeting.　As far as we're concerned, the guy quit.　He

19　wouldn't answer the phone.　We, subsequently, when we got

20　in the following Monday, he was already working for

21　Wal-Mart while he was, quote, sick.

22　Q.　Did Mr. Eberhard tell you that he had done

23　anything else about the allegation or the complaint other

24　than speak with Mr. Moore?

James Morgan                119

1    A.   Well, I don't know.  But I would assume that he

2    spoke with Mr. Goodermuth too.

3    Q.   I don't want your assumption.  I just want to

4    know what you know or what he told you that you recall.

5    A.   I told you what I recall of the conversation.

6    Q.   And then you said after you became aware of the

7    allegation, you called Mr. Eberhard.  Did you talk to

8    Mr. Goodermuth yourself?

9    A.   Directly, no.

10   Q.   So who did?

11        MR. NEUBERGER:  You mean at that time?

12   Q.   At that time, who did?

13   A.   Eberhard.

14   Q.   And Mr. Eberhard told you that he had spoken to

15   Mr. Goodermuth, correct?

16   A.   I can't say that he said that he spoke with

17   Mr. Goodermuth, but I do know that I was made aware of

18   what occurred.

19   Q.   Meaning what, what occurred where?

20   A.   Well, I was notified in May that something

21   occurred the prior year.  And the employee had worked and

22   then didn't work and said he was sick and then already

23   had a job at Wal-Mart.  That was all that I was aware of

24   until the EEOC.

James Morgan                120

1     Q.  And when you received notice from the EEOC of the

2  charge, you said you spoke with Mr. Eberhard.  Did you

3  direct Mr. Eberhard to do anything about the charge?

4     A.  I don't believe so because I was waiting to get

5  the details.  I believe Mark Maddox set up an appointment

6  with me to meet at the Paper Company.  So I was not aware

7  of how serious the situation was and what actually

8  happened.

9     Q.  So when you previously testified that

10  Mr. Eberhard or that somebody spoke with Mr. Goodermuth

11  and told him if it ever happened again that he'd be

12  fired --

13     A.  That was Eberhard.

14     Q.  But how do you know that?  Do you know that from

15  reading documents in this case or did Mr. Eberhard tell

16  you he said that or did Mr. Goodermuth tell you that?

17     A.  No, Mr. Goodermuth didn't.  No, it would have

18  been Eberhard.

19     Q.  How do you know that Mr. Goodermuth had been

20  chastised in some way or warned?

21     A.  Because I was told by Mr. Eberhard.

22     Q.  Do you know if Mr. Eberhard disciplined

23  Mr. Goodermuth in any other way?

24     A.  I don't believe he did.

James Morgan                121

1     Q.   Do you know if he put anything in his file, like

2   any written warning or anything in his file?

3     A.   I don't know.

4     Q.   Do you know that in December of 2003,

5   Mr. Goodermuth was given a $500 bonus?

6     A.   Yes.

7     Q.   And if you had known that he had been accused of

8   what you knew after that, would you have approved the

9   $500 bonus for him?

10     A.   What was the time period again?

11     Q.   The charge, the incident complained of regarding

12   the application occurred in November, 2003.  So I'm

13   talking about --

14     A.   True.  Then I was not aware of it.

15     Q.   My question is:  If you had been aware of that,

16   would you have approved a bonus for Mr. Goodermuth in

17   December of 2003?

18     A.   Perhaps.  But it would have been cut.

19     Q.   Have you ever heard that Mr. Goodermuth was

20   charged with racial discrimination while he was in the

21   service?

22     A.   No.

23     Q.   So subsequent to you finding out, you said you

24   had a meeting with the employees?

James Morgan          122

1    A.  Yes.

2    Q.  Do you remember when that occurred?

3    A.  It would have been sometime in close proximity to

4  when the meeting was held with Mark Maddox.

5    Q.  Do you recall if it was before or after that?

6    A.  It was after the meeting.

7    Q.  After the meeting with Mark Maddox?

8    A.  Uh-huh.

9    Q.  Now, when you met with Mr. Maddox, did you meet

10  with him alone or did you meet with him in a group with

11  Mr. Eberhard and Mr. Goodermuth?

12    A.  Initially, it was the four of us.  Then I believe

13  that Goodermuth left and the meeting continued with the

14  three of us.

15    Q.  And did you hear Mr. Goodermuth admit to

16  Mr. Maddox that he did, in fact, make racial jokes in the

17  workplace?

18    A.  Yes.

19    Q.  And did you do anything about that?

20    A.  I didn't do anything.  It was the general

21  manager's, who is the first in line for the

22  responsibility.

23    Q.  Did you say anything to Gary Eberhard about that?

24    A.  Yeah.


James Morgan                123


1    Q.  What did you say?

2    A.  We can't have these kind of things going on.

3    Q.  And what was his response?

4    A.  I agree with you.  It's not going to happen

5  again.

6         (Morgan Deposition Exhibit No. 7, Letter to

7  Mr. Maddox Dated June 5, 2004, was marked for

8  identification.)

9  BY MS. CLICKNER:

10    Q.  Let me give you a document marked Exhibit 7.

11  Take a moment to look at that.  Can you identify this

12  document?

13    A.  It's a letter that I sent to Mark Maddox.

14    Q.  Dated June 15, 2004?

15    A.  Correct.

16    Q.  Mr. Maddox, is he an investigator for the EEOC?

17    A.  Correct.

18    Q.  And attached to this letter are answers to

19  questions that Mr. Maddox had posed to the Paper Company;

20  is that correct?

21    A.  After Mr. Goodermuth left, Mr. Maddox said I'm

22  going to give you a questionnaire that I would like you

23  to complete and send it back to me by a certain date.  I

24  don't recall the date.  I told Mr. Eberhard to complete

                    James Morgan            124


1  the application himself.

2    Q.  To answer the questions you mean?

3      A.   Yeah, answer the questions and forward it to me.

4   And I proofread it and may have changed the spelling or

5   diction or something, but not any facts, hard facts.

6      Q.   So you have approved what is in these answers; is

7   that correct?

8      A.   Yes.

9      Q.   On the last page, Paragraphs 15, it says that our

10  company is minority owned.  What does that mean?

11     A.   Women are considered a minority, I think, by the

12  federal government.

13     Q.   Okay.  Is that what that means?

14     A.   Yes.  I hate to say it, but that's the truth.

15     Q.   So Paragraph 5, it indicates that Mr. Maddox's

16  visit was on May 5th, 2004.  Does that sound about right

17  to you?

18     A.   Yeah.  I said earlier May or June.

19     Q.   And it said, "We have no written policy.  It's

20  verbal only."  It says, "We do conduct team meetings

21  covering this and other subjects."  Do you know whether

22  that's true or not true?

23     A.   Well, I believe that it was probably only a

24  verbal policy.  But we never had a complaint when Gene

                    James Morgan              125

1   Fox was there.  So I would think that it was, that there

2   was no written policy.

3      Q.   The question is:  Do you know if there were team

4    meetings covering, quote, this and other subjects?  Now,

5    I'm assuming that is referring to racial harassment.  The

6    question is:  Do you know for sure of your own knowledge

7    whether team meetings covered issues of racial

8    harassment?

9      A.  No.

10     Q.  Did you ever tell your general manager that he,

11   either Mr. Fox or Mr. Eberhard, should be covering this

12   subject in team meetings?

13     A.  Certainly not Mr. Fox because contrary to one of

14   the Moore boys' statements, racial harassment was

15   occurring before Gary Eberhard.  And that's the first

16   time I had heard that.  And Mr. Fox, somewhere in this

17   paperwork it states they complained to Mr. Fox about it,

18   Anthony Moore.  And there was -- we contacted Mr. Fox who

19   lives and works in Smyrna.  And there was never any

20   racial harassment charge.  And Doug Goodermuth was there

21   before Anthony Moore and after.

22     Q.  Now, are you aware of Delaware's state law

23   regarding harassment in the workplace?

24     A.  I can't say that I am.  I assume there is, but

                James Morgan              126


1    I've never seen a written policy.

2      Q.  Are you aware then that, under Delaware law, you

3    would be liable for this kind of conduct because you have

4    four or more employees?

5    A.  No, I was not aware of that.

6    Q.  Are you aware that Delaware law requires

7  employers of four or more employees to post

8  anti-harassment signs?

9    A.  No, I'm not.

10        MR. NEUBERGER:  For the record, I want the

11  record to reflect that I disagree with any legal

12  conclusions found in your questions, the last two.

13  BY MS. CLICKNER:

14    Q.  Paragraph 10, it says, "Both named harassers,

15  that would be Mr. Goodermuth and Mr. Eberhard, are in

16  management."  Is that true?

17    A.  No.  It's a misnomer.  Goodermuth was not in

18  management.

19    Q.  In 2002 and 2003, would it have been appropriate

20  for Mr. Eberhard to tell Paper employees that they could

21  not call you to complain about things?

22    A.  First of all, I don't believe that he was there

23  in 2002.  I believe in 2003, the two general managers

24  overlapped until the 1st of the year.  And your question


                James Morgan              127


1  again was --

2    Q.  Would it have been appropriate for a general

3  manager to tell a Paper employee that they could not call

4  you to complain about things, that they needed to go

5  through the general manager?

6    A.  No.

7    Q.  No, it would not have been appropriate?

8    A.  It would have not -- if someone wanted to contact

9   me, they should be able to contact me.  If there were

10   instructions out there never to contact me, I'm not aware

11   of it.

12    Q.  And subsequent to your becoming aware of the EEOC

13   charge, did you create a harassment policy for the Paper

14   Company?

15    A.  I don't know there was a long-blown policy.  But

16   I believe that it, there would have been something posted

17   about racial harassment.  Plus, there had been two

18   meetings about it.

19    Q.  Two meetings.  Did you attend both of those

20   meetings?

21    A.  I believe just one.

22    Q.  How do you know there was a second meeting?

23    A.  The only thing I have is what I was told by

24   Mr. Eberhard that there was a second meeting.


                James Morgan            128


1    Q.  Have you ever been informed that Mr. Goodermuth

2   had not received and signed for a copy of the harassment

3   policy?

4        MR. NEUBERGER:  I'm sorry?  I don't

5   understand your question.  The EEOC charge?

6        MS. CLICKNER:  No.  We'll mark this document

7   8.

8        (Morgan Deposition Exhibit No. 8, Letter to

9   All Employees Dated August 3, 2004, was marked for

10   identification.)

11   BY MS. CLICKNER:

12    Q.  Can you identify this document?

13    A.  It's a memo that was issued to employees and

14   probably posted on the bulletin board.

15    Q.  Did you draft this memo?

16    A.  In looking at the wording, I doubt that I drafted

17   it.  But it was probably taken from some other source and

18   we decided to use it as our policy on racial harassment.

19   I mean, we may have been given something.  We may have

20   gone to the internet.  Rose is very active on the

21   internet where HR policies are drafted and you can get

22   posters and whatnot.  But I would not have started it

23   from scratch.

24    Q.  Did you adopt this as the policy for the Paper


                James Morgan            129


1   Company?

2    A.  Yes.

3    Q.  You signed it at the bottom; is that correct?

4    A.  Yes.

5    Q.  Also on the second page is the signature of

6   Carlyle Moore, 9/1/04; is that correct?

7    A.  Correct.

8    Q.   To your knowledge, was every employee of the

9  Paper Company given a copy of this?

10    A.   I don't honestly know.  They should have been.

11  And I believe it was posted on the company bulletin

12  board.

13    Q.   Was there a policy for every employee to receive

14  a copy of this and sign for it to put it in their

15  personnel file?

16    A.   I believe it was, yes.

17    Q.   And do you know whether Mr. Goodermuth has ever

18  received a copy of, signed for a copy of this?

19    A.   I don't know for sure.  I assumed so.  But there

20  was something that occurred right around here in, I

21  believe, early September.  He had a heart attack at the

22  plant.  And he was out from this period in September

23  until January, I believe, '05.

24    Q.   Do you know if he has ever been given a copy of

                    James Morgan            130

1  this to sign for and have it placed in his personnel

2  file?

3    A.   I don't know that, no.

4    Q.   Would it bother you if he had not received a copy

5  of this policy?

6    A.   It would bother me, but I would think that he's

7  gotten the message.

8    Q.   Well, what does it mean to get the message?

9    A.  If you are told if it ever happens again you will

10   be fired, that's a very strong message.

11    Q.  So if there is no copy of a signed, a policy

12   signed by Mr. Goodermuth in his personnel file, is it

13   safe to assume that he has not signed for a copy of it?

14    A.  I wouldn't say a hundred percent, but it would

15   appear to.

16    Q.  Have you received any other complaints of

17   harassment since the complaint by Mr. Anthony Moore in

18   November?

19    A.  Have I received --

20    Q.  Has the company?

21       MR. NEUBERGER:  You mean except what you

22   sent over to me and I sent to him?

23       MS. CLICKNER:  Other than my letters to you.

24       THE WITNESS:  Only one that I've seen is


              James Morgan          131


1    whistling Dixie.

2    BY MS. CLICKNER:

3     Q.  And when you say there was something posted at

4    the Paper Company, is this document what you are

5    referring to?

6     A.  Probably, but I can't say for sure.

7     Q.  Now, this document says that it would be

8    appropriate for a complaining employee to call any member

9    of management, including the company president; is that

10  right?

11    A.  Yes.

12    Q.  And your number is not bolded here in any way; is

13  it?  There is an accounting number at the top of the

14  paper, but there is nowhere here that says what is the

15  phone number to call you at; is there?

16    A.  No.  If someone were working there, they would

17  know that there is no accounting department in Smyrna.

18  Therefore, they should go to the phone number that's near

19  the head of the letterhead on the right-hand side, the

20  numbers for Smyrna.

21    Q.  For the accounting department of P.T. Morgan

22  Paper Company, right?  It doesn't say that that's your

23  phone number; does it?

24    A.  No.


                    James Morgan              132


1    Q.  And the employees, for example, the hourly

2  employees such as Mr. Anthony Moore and Mr. Carlyle Moore

3  and Mr. Patrick Moore and Mr. Tingle, they wouldn't know

4  about the management structure of the Packaging Company;

5  would they?

6    A.  You mean the organization chart?

7    Q.  Yes.

8    A.  Well, they would know that I am Gary Eberhard's

9  boss and next in line is Gary Eberhard.

10    Q.  But they wouldn't know that you work at the

11    accounting office in Severna Park; would they?  In fact,

12    there was no accounting office in an Severna Park; was

13    there?

14    A.  We had moved by that time.  But the phone numbers

15    are for Arnold.

16    Q.  But do you have any reason to assume that the

17    employees that I just mentioned would know that that was

18    the phone number to reach you at?

19    A.  I would make the assumption that if somebody were

20    trying to get ahold of me, and I would start there.

21    Q.  That's what you would do?

22    A.  That's what I think most people would do.

23    Q.  Have you ever disciplined Gary Eberhard for his

24    handling of the complaint by Anthony Moore?


                    James Morgan              133


1    A.  Other than saying we can't allow this to occur in

2    the future.

3    Q.  Do you consider that a discipline?

4    A.  You probably have to do with the manner in which

5    it was spoken.

6    Q.  You are saying these are words you spoke the

7    Mr. Eberhard; is that true?

8    A.  Yes.

9    Q.  What manner did you use when you spoke those

10    words to him?

11    A.  In a very stern manner.

12   Q.  Did you put anything into his personnel file?

13   A.  No.

14   Q.  And did you dock his --

15   A.  No.

16   Q.  -- bonus for 2004 because of this incident?

17   A.  No.

18   Q.  Does Gene Fox still have any kind of interest in

19   the Paper Company?  Is he a vice president or anything of

20   the Paper Company?  Was he ever a vice president of the

21   Paper Company?

22   A.  Not -- I don't believe so, no.

23   Q.  Do you know why Dunn & Bradstreet reports that he

24   is a vice president of the Paper Company?


                    James Morgan              134


1    A.  No, I don't.

2    Q.  Have you ever heard Doug Goodermuth make any kind

3    of racial joke or statement or comment?

4    A.  No.

5    Q.  Have you ever heard him make comments on the type

6    of food that African-Americans eat such as referring to

7    watermelon or fried chicken?

8    A.  I think the only time was in the meeting with

9    Mark Maddox.

10   Q.  If you had heard that he had made some, a comment

11   about African-Americans eating watermelon or eating fried

12   chicken, would you have thought that was appropriate or

13    inappropriate?

14    A.  I would have to hear it in the context of him

15    talking rather than just lifting a phrase out.

16    Q.  So you don't have an opinion, at this time,

17    whether him commenting on the type of food that

18    African-Americans eat would be a violation of the P.T.

19    Morgan policy; is that true?

20    A.  Say that again.

21    Q.  If you heard Douglas Goodermuth making comments

22    about the kind of food that African-Americans eat, such

23    as watermelon or fried chicken, would you think that that

24    was a violation of the P.T. Morgan anti-harassment


                    James Morgan                135


1    policy?

2    A.  I couldn't answer it unless I heard the context.

3    That's the very first time I've ever heard that.  I mean,

4    my family eats chicken and my family eats watermelons.  I

5    don't think it's restricted to any race.  It would -- I

6    would have to hear it in the context of other than asking

7    me a question like that.

8    Q.  Are you saying to me that you've never heard that

9    it's derogatory, that people make derogatory comments

10    about African-Americans in terms of them eating

11    watermelon and fried chicken?

12    A.  Never.  Let me tell you a little story about my

13    background.  It goes back a ways.  But when I became a

14    cadet, you walk in one door with your clothes on and you

15    give up all your jewelry, all your money.  You have a

16    picture taken of your body in a supporter only.  You are

17    given a T-shirt, a pair of shorts and gym shoes and told

18    to report out that door.  Plus, you have a little carry

19    on bag.  They say report to the male or female -- there

20    were no females at that time -- who is wearing a red

21    sash.  And that's when they light into you.

22        Eventually, they say go down and see Captain

23    Drummond and point you in the right direction.  Do you

24    remember the radio show Bulldog Drummond?  Okay.  In the


        James Morgan            136


1    '40s and '50s.  Anyway, it was a burly red-haired cadet

2    captain.  And after going through the standard of asking

3    you something, then everything has to end in sir.  You

4    are either no, sir, yes, sir, no excuse sir.  Morgan,

5    drop your bag.  So I put the bag down on the -- he said I

6    told you to drop the bag.

7        After we went through that routine, he

8    started, Morgan, do you have any racial prejudices?  I

9    said no, sir.  He asked me three times.  And I said no,

10    sir.  I was assigned a room on the second floor.  When I

11    got there, I had a black roommate.  He was pretty sharp.

12    He had been in the Air Force for three years.  He knew

13    how to put a uniform on.  He knew how to spit, shine

14    shoes that you take your two fingers at your waste and

15    see the reflection in your shoes.  And he was a great

16    roommate.

17         MR. NEUBERGER:  Jim, maybe we are just

18    going --

19         THE WITNESS:  Okay.  End of story.

20         MR. NEUBERGER:  That's enough.

21         THE WITNESS:  Anyway, I don't have racial

22    prejudice.  My ranger buddy was black.  The people I went

23    to parachute school were black.  People I went to flight

24    school were black.  Some of my best friends were black

                James Morgan              137

1    and bosses.

2         I forget to tell you, he quit.  And you know

3    why he quit?  Because a black senior rode him day and

4    night.  Every time he saw him, he stopped him.  He later

5    sued the Army, later sued the Air Force for racial

6    discrimination.  End of story.

7    BY MS. CLICKNER:

8    Q.  Have you ever heard of Mr. Goodermuth make

9    references to a plantation?

10    A.  The only time I've heard plantation is Hillary

11    Clinton.  No.

12    Q.  Hillary Clinton?

13    A.  Martin Luther King Day?

14         (Thereupon, a discussion was had off the

15    record.)

16          THE WITNESS:  I know what a plantation is,

17  but --

18  BY MS. CLICKNER:

19     Q.  If you heard Mr. Goodermuth talking about a

20  plantation to the black employees, do you have any idea

21  if that would be offensive to them?

22     A.  I would know now.  I wouldn't have known before

23  Martin Luther King Day, 10 days ago, two weeks.  Never

24  heard any reference to that.  And I was in Alabama when


James Morgan              138


1  Martin Luther King made the walk to Selma.  So I

2  remember.

3     Q.  Did you ever hear that Mr. Goodermuth, if

4  Mr. Goodermuth had referred to black employees as crows,

5  do you believe that that would have been offensive to

6  them?

7     A.  Yes.

8     Q.  Would that have violated your current policy?

9     A.  It would, yes.

10     Q.  Does the Paper Company plant downsize its

11  operation when it moves?

12     A.  Not currently.

13     Q.  Where is the new location?

14     A.  Two miles.

15     Q.  Do you have any idea why Gary Eberhard has a

16  stack of blank termination forms?

17    A.  We haven't terminated anybody -- well, take that

18    back.  No.  No, I don't.  Where does he keep it?

19    Q.  That I don't know.

20    A.  I'm sure he's got them, but I don't know where

21    they are.

22        MS. CLICKNER:  Give me about five minutes.

23        (Thereupon, a short recess was had.)

24        MS. CLICKNER:  I have no more questions.


                James Morgan            139


1        MR. NEUBERGER:  I thought I must have had a

2    few.  Let me just take a minute.

3            EXAMINATION

4    BY MR. NEUBERGER:

5    Q.  Jimmy, I did have just a couple questions.  You

6    had put on the record a little earlier the sales figures

7    for the Paper Company for the years 2002, '3, '4, and '5.

8    They were a little bit over a million, a little bit under

9    the million.  Maybe for the Packaging Company, if you

10    have a memory of --

11    A.  For what years?

12    Q.  We'll just try to take '5, then '4, then '3, then

13    '2.  The Packaging, do you have some idea of what its, on

14    the tax return, gross sales or whatever?

15    A.  That would be gross sales.

16    Q.  Ordinary income for the business.

17    A.  '05 would be about five million.  For '4,

18    four-and-a-half.  Three million -- I mean, '3, eight

19    million.  For '2, 75.  Did you want for '1 too?

20      Q.  No.  And this may or may not be clear on the

21    record.  That's why I wanted to ask you.  You were

22    explaining how Rose being present at Paper, you had

23    talked about that.

24      A.  Right.


                                140


1      Q.  And am I correct that one of the reasons why you

2    explained she was at Paper more than normal was that

3    she's involved in gathering data related to the lawsuit?

4    Was that one of the things you talked about?  You

5    mentioned two situations she's over there more.

6      A.  This situation and --

7      Q.  This situation meaning the lawsuit?

8      A.  Right.  And the other one is the move from an old

9    building into a brand new and where you are promised

10    something and the developer or builder says that's not

11    what I said.

12      Q.  Okay.  That's fine.

13      A.  And that's a lot of it right now.

14          MR. NEUBERGER:  That's all the questions I

15    have, counsel.

16          MS. CLICKNER:  Thank you.  You are done.

17          (Thereupon, the deposition concluded at 4:40

18    p.m.)

19          - - - - -

20          INDEX TO TESTIMONY

21
    JAMES MORGAN                    PAGE
22
      Examination by Ms. Clickner        2
23      Examination by Mr. Neuberger          139

24          - - - - -



                    141



1          INDEX TO EXHIBITS

2    MORGAN DEPOSITION EXHIBIT NO.          PAGE

3    1, Notice to Employees, Simple IRA......... 51:17
      2, Paper Company Organization Charts....... 65:5
4    3, Handwritten Notes...................... 72:7
      4, Job Description........................ 95:10
5    5, Schedule K-1.......................... 100:12
      6, Tax Return for S Corporation........... 102:23
6    7, Letter to Mr. Maddox Dated June 5, 2004 123:6
      8, Letter to All Employees................ 128:8
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

142

1

2

3

4

5

6

7          REPLACE THIS PAGE

8

9          WITH THE ERRATA SHEET

10

11          AFTER IT HAS BEEN

12

13          COMPLETED AND SIGNED

14

15          BY THE DEPONENT.

16

17

18

19

20

21

22

23

24

143

State of Delaware )
                 )
New Castle County )

CERTIFICATE OF REPORTER

I, Anne L. Adams, Registered Professional
Reporter and Notary Public, do hereby certify that there
came before me on the 24th day of January, 2006, the
deponent herein, JAMES MORGAN, who was duly sworn by me
and thereafter examined by counsel for the respective
parties; that the questions asked of said deponent and
the answers given were taken down by me in Stenotype
notes and thereafter transcribed into typewriting under
my direction.

I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

Anne L. Adams
Certification No. 105-RPR
(Expires January 31, 2008)

DATED:  January 27, 2005

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **EQUAL EMPLOYMENT** | ) |
| **OPPORTUNITY COMMISSION,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 04-1304** |
| | )   **Judge Kent A. Jordan** |
| | ) |
| **P.T. MORGAN PAPER COMPANY**, an | ) |
| affiliate of **P.T. MORGAN PACKAGING** | ) |
| **COMPANY,** | ) |
| **Defendant.** | ) |

## CERTIFICATE OF SERVICE

   I, Seth M. Beausang, counsel for Plaintiff, hereby certify that on this 2nd day of February, 2006, a correct copy of the foregoing Commission's Supplemental Appendix was served by electronic filing:

       Thomas S. Neuberger and
       Steven J. Neuberger
       Two East Seventh St., Suite 302
       Wilmington, DE 19801-3725
       Attorneys for Defendant


_____/s/ Seth M. Beausang_____
       **SETH M. BEAUSANG, ASST. U.S. ATTORNEY**