February 3, 2006	**<u>Via CM/ECF Filing</u>**
	**and HAND DELIVERY**

The Honorable Kent A. Jordan
United States District Court
District of Delaware
844 King Street
Wilmington, DE 19801

RE:	<u>EEOC v. P.T. Morgan Paper Company</u>, C.A.No. 04-1304-KAJ
	Supplemental Answering Letter Memorandum

Dear Judge Jordan:

The deposition of James B. Morgan was taken on January 24, 2006. During the course of the deposition, the relations between the P.T. Morgan Paper Company ("Paper Company") and the P.T. Morgan Packaging Company ("Packaging Company") were explored in detail. The testimony of Mr. Morgan makes apparent the extensive efforts taken to keep the two Companies separate and distinct. Coupled with the record contained in defendant's Summary Judgment Appendix, under Third Circuit law, these two Companies are not operationally entangled as to warrant substantive consolidation. <u>Nesbit v. Gears Unlimited, Inc.</u>, 347 F.3d 72 (3d Cir. 2003). Adopting the Third Circuit's language, the eggs of these two Companies are not so scrambled that the Court cannot unscramble them. <u>Id.</u> at 86.

On February 2, 2006, plaintiff EEOC filed a Supplement to its Brief in Opposition to Defendant's Motion for Summary Judgment and Brief in Support of its Cross-Motion for

The Honorable Kent A. Jordan
February 3, 2006
Page 2

Summary Judgment. (D.I.60)[1]. Unfortunately, plaintiff has again attempted to shift the Court's focus away from the relevant and binding Third Circuit law of Nesbit.

> The inquiry in a Title VII context focuses on the degree of "operational entanglement." The relevant factors in determining this include: (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (*e.g.*, hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with them as one unit, (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary, and (4) whether one entity does business exclusively with the other.

Nesbit, 347 F.3d at 86.

Plaintiff gives the Court a very skewed recitation of Mr. Morgan's thorough deposition testimony, selectively using phrases of his testimony and taking it out of context. In this letter, defendant hopes to refocus the Court's attention on the relevant facts which directly correspond to the above four factors set forth by the Third Circuit in Nesbit for substantive consolidation.

**1.   Separate Corporate Formalities Observed:**

- It is undisputed that the Paper Company and the Packaging Company are solely owned by James and Peggy Morgan. (Morgan 5-6)[2].

- But, the two Companies have separate Boards of Directors and are incorporated separately[3]. (Morgan 7, 15).

---

[1] Plaintiff's Supplemental Brief is referred to as (SB __).

[2] The deposition testimony of James Morgan of January 24, 2006 is attached to Plaintiff's Supplemental Brief as Exhibit A. It is referred to as (Morgan __).

[3] Plaintiff needlessly attempts to smear the honesty behind Mr. and Mrs. Morgan's establishment of two separate Companies by stating that they "have attempted to cover up the true nature of the companies' relationship by maintaining the appearance of separation through separate incorporation." (SB at 18). While plaintiff asks the court to "look beneath the surface to discovery the true story," defendant asserts the true story is readily apparent on the surface. The

The Honorable Kent A. Jordan
February 3, 2006
Page 3

- The two Companies have separate post office box numbers. (Morgan 32).

- The Paper Company and the Packaging Company have never been referred to as the "P.T. Morgan Companies" outside the context of this present litigation. (Morgan 41-42). It would have been incorrect for any Packaging Company employee to use this term. (Morgan 41).

2. **Separate Personnel Functions**

    - Mr. Morgan is responsible for hiring the Paper Company's General Manager, Gary Eberhard. (Morgan 53). Then Gary Eberhard is responsible for hiring and disciplining all Paper Company employees. (Morgan 53).

    - Plaintiff points out that Mr. Morgan hired the General Manager and that he has a role in disciplining hourly employees at the Paper Company. (SB at 8). First, as Vice-President, Mr. Morgan is the only person who could have hired a General Manager with his wife ill. Secondly, Mr. Morgan testified that he "ha[s] the authority, but I have never done it. From a military background, I like to work up the chain of command." (Morgan 58). Mr. Morgan testified that on one occasion he gave permission for a team leader to tell an employee to leave the premises. (Morgan 59). As the Company's Vice-President he obviously has the authority, and the right, to discipline employees, however, he refrains from doing so unless necessary. (Morgan 58).

    - Plaintiff also points out that Mr. Morgan approved an anti-harassment policy for the Paper Company. (SB at 8-9). However, plaintiff *again* fails to address the fact that Mr. Morgan did so in his official capacity. (See D.I.55 Defendant's Reply Brief at 7).

    - Unfortunately for plaintiff, these situations do not show an intermingling of the personnel functions between the two Companies. (SB at 8). The Third Circuit in Nesbit stated that it is "unsurprising" that a company's president and shareholder will "occasionally participat[e]" in the company's management. 347 F.3d at 88. "Overlapping ownership and management [of the two companies] are insufficient, without more, to warrant substantive consolidation." Id. n.11.

3. **Distinct Product Lines:**

---

two Companies are separate and Mr. and Mrs. Morgan have gone to great lengths to maintain their separateness.

The Honorable Kent A. Jordan
February 3, 2006
Page 4

- The Paper Company is engaged in the sorting and recycling of old grades of wastepaper to corrugated boxes. (Morgan 14). The Paper Company manufactures corrugated pads and liners and also participates in the warehousing of finished, new corrugated boxes. (Morgan 15-17).

- The Packaging Company purchases and sells finished corrugated boxes and pads. (Morgan 18).

- The Packaging Company sometimes serves as a "broker for the Paper Company's products. (Morgan 22-23). Only roughly 10% of the Packaging Company's business consists of brokering products produced by the Paper Company. (Morgan 25). This 10% is 25-30% of Paper's total sales. (Morgan 26-27). As a consequence, 70-75% is not sold by the Packaging Company. (Morgan 27).

4. **Distinct Paper Company Sales and Billing:**

- When the Paper Company receives a product order, the order can be taken by its General Manager, a manufacturer's rep (which are essentially outside sales reps), or Mr. Morgan. (Morgan 27-28). The General Manager, or occasionally a team leader or senior employee, if the General Manager is unavailable, will create a bill of lading. (Morgan 29). This bill of lading is then sent to Robbi Smith who works in the Packaging Company's accounting department, but provides these paid accounting services to the Paper Company. (Morgan 30). After delivery, the signed bill of lading or delivery receipt is sent back to Robbi Smith. (Morgan 30-31). She then creates an invoice. (Morgan 30). The products are invoiced to the customer in the name of the Paper Company. (Morgan 28).

5. **Costs are Reimbursed, Not Absorbed**

- The Paper Company manufactures pads. (Morgan 90). At times these pads may be manufactured for the Packaging Company specifically based on its customer's specifications. (Morgan 90-91). The Packaging Company purchases these pads from the Paper Company for a direct cost. In turn, the Packaging Company reimburses the Paper Company for labor costs and any material used through a "standard costing system." (Morgan 91-93).

6. **Warehousing Inventory Is Kept Distinct and Costs Are Reimbursed, Not Absorbed:**

- On occasion, Packaging Company products are warehoused at one of the company's various vendors or at the Paper Company in Smyrna, Delaware.

The Honorable Kent A. Jordan
February 3, 2006
Page 5

        (Morgan 19-20).

- If the Packaging Company warehouses products at the Paper Company, the Packaging Company reimburses the Paper Company. (Morgan 20). This reimbursement is in the form of an "upcharge" which is the cost to load or unload a trailer containing the products. (Morgan 22).

- For example, when the Paper Company purchases boxes from companies which are seconds, or deemed unusable by a certain company, the Paper Company takes possession. (Morgan 20, 81-82). The reason for this is that if something happened to the inventory, the General Manager presumably would be aware of the damage and would be responsible. (Morgan 82-83). It would not make sense for Mr. Morgan to be responsible for the inventory when he is 70 miles away from the warehouse. (Morgan 82).

- Once the Paper Company has possession, either the Paper Company or the Packaging Company can sell the products. (Morgan 83). If the Packaging Company makes the sale, then the Paper Company sells these boxes to the Packaging Company at cost and does not make a profit. (Morgan 83). "Nothing is given away between the two [C]ompanies." (Morgan 80). When this occurs, the Packaging Company pays the Paper Company for the cost of the boxes *plus* an "upcharge" which is the cost of unloading the trailer and any labor involved. (Morgan 83-84).

- Plaintiff relies heavily on the fact that no profit is made by the Paper Company for this "service." (SB 10-12, 20-21). However, plaintiff fails to understand the core concept behind this relationship. Here, the Paper Company purchases, takes possession of products and warehouses them. (Morgan 81-84). Essentially the Paper Company has the same opportunity to sell these products as the Packaging Company. When the Packaging Company makes the sale, they reimburse the Paper Company for the cost *plus* an upcharge. (Morgan 83-84). It is no different than if the Packaging Company had purchased and taken possession of them from the beginning. The Paper Company had the same opportunity to compete and make a sale where they could have made a profit.

7. **Maintenance Services Are Paid Separately By Each Company:**

- The Paper Company provides maintenance services for equipment primarily used for the Packaging Company. (Morgan 77). The Paper Company has equipment which appears on the Paper Company's property ledger, but is run primarily for the Packaging Company. (Morgan 78). If any maintenance work is done on this

The Honorable Kent A. Jordan
February 3, 2006
Page 6

- equipment, the Paper Company bills the Packaging Company to recoup its costs for the repair or maintenance. (Morgan 86).

- Additionally, the Packaging Company pays for the entire maintenance of this equipment, including electricity and propane. (Morgan 86). "[A]nything that is associated with something that is pretty much done exclusively for the Packaging Company, [the Paper Company] bill[s] the Packaging Company for their[] costs." (Morgan 86).

- For example, the Paper Company owns three fork trucks. (Morgan 87). One of these fork trucks is used primarily for the Packaging Company. (Id.). The Paper Company keeps track of the number of propane tanks used for this fork truck and bills the Packaging Company. (Morgan 86-87).

**8.     Electricity, Heat and Rent Are Paid Separately By Each Company:**

- Basically, since the Packaging Company runs part of its business out of the Paper Company's location in Smyrna, Delaware, the electricity, heat and rent are split between the two Companies based on consumption. (Morgan 88). The Companies have painstakingly succeeded in keeping track of space and utilities used by the Packaging Company in Smyrna. Interestingly, this effort would be a waste of the companies' effort and time if they were operationally entangled and operating as one integrated Company.

- The electricity is contained on one invoice for the property in Smyna. (Morgan 87). The two Companies have studied the portion of the building where the pad work is done for the Packaging Company and have calculated a percentage of the total bill for the costs of lighting in that section. (Id.). Also, the electricity used by the four machines is calculated into the bill. (Id.). A total figure of 35% is charged to the Packaging Company. (Id.).

- There are two separate heating bills from the Town of Smyrna. (Morgan 87). One invoice goes directly to the Packaging Company which is a read from a separate meter. (Morgan 87-88).

- Additionally, the rent is split as a percentage of the number of square feet that the Packaging Company uses. (Morgan 88).

- These are direct instances and proof of the Companies making an extensive effort to ensure they are operating at arm's length.

The Honorable Kent A. Jordan
February 3, 2006
Page 7

9. **Employee Benefits Again Are Separate:**

- The two Companies have separate accounts with Dean Witter for a Simple IRA plan. (Morgan 51-52). The Dean Witter representative, Chris Persico, had *separate meetings* with each company to explain the Simple IRA plan. (Morgan 53). Gene Fox, the Paper Company's previous General Manager, negotiated with Chris Persico to set up the account for the Paper Company; Mr. Morgan, or someone from the Packaging Company's accounting department, negotiated with him to set up the account for the Packaging Company.

10. **As With Items 5, 6, 7 And 8 Above, Administrative Services In Good Faith Were Treated Separately And Reimbursed:**

- In the early to mid-1990s, a decision was made that the Paper Company would pay the Packaging Company an administrative charge of $2,000 per month for work done by Packaging Company employees. (Morgan 48-49).

- The $2,000 was determined using observation and estimating a cost per hour for services provided[4]. (Morgan 51). Despite plaintiff's argument, an expert witness is not needed to determine whether from a business perspective, the reimbursement amount is reasonable. (See SB 6). Mr. Morgan has been in and around this type of business since 1951. (Morgan 8). Who better to make an assessment for this type of reimbursement than the owner of both companies and an experienced veteran in the specific business?

- While Mr. Morgan admits the amount of services provided in 2005 as opposed to 1995 is higher, he points out this is primarily due to the sudden sale of the leased Smyrna property and the need to relocate the business and the instant litigation. (Morgan 51). In other words, absent these recent two extraordinary circumstances, the amount of services would be the same.

- Also of importance, as Mr. Morgan testified, in 1995 the Paper Company sales were substantially higher at 50%. (Morgan 50). The Paper Company also had about 15 more accounts than in 2004. (Id.). However, in 2005, the Paper Company was in need of a new computer program and someone to operate it.

---

[4] Plaintiff states that neither Company engaged in "due diligence to determine an appropriate amount." (SB at 5). However, plaintiff failed to point out that Mr. Morgan testified to using "observation" and a "guesstimate" of how many hours and a "type of cost per hour" analysis. (Morgan 51).

The Honorable Kent A. Jordan
February 3, 2006
Page 8

       (Morgan 42-45). So while the monetary reimbursement has remained the same, the type of the services has changed. In 1995, the services were mainly accounting, and the Paper Company had more accounts and higher sales. (Morgan 51,50). Conversely, in 2005, the Paper Company has less accounts and lower sales, but a higher demand for administrative services. (Morgan 50,42-45). Thus, the amount of services provided has remained the same, and their type has changed.

- Since the beginning of 2005, Rose Grabowski, a Packaging Company employee, provides on-site computer services to the Paper Company in Smyrna. (Morgan 42-49). Ms. Grabowski began providing these services when the Paper Company changed General Managers and the new General Manager needed help running a computer inventory program. (Morgan 42-44). Ms. Grabowski presently spends about 20% of her time working on Paper Company business, but this number is higher than usual due to the amount of time she has spent dealing with the relocation of the Smyrna property[5] and gathering information concerning the present lawsuit. (Morgan 67,44-45).

- Robbi Smith, a Packaging Company employee, provides accounting services for the Paper Company, such as compiling financial statements and payroll. (Morgan 32,36,45,61-62 ). Her predecessor provided these same type of services. (Morgan 53, 67). Ms. Smith spends roughly 40% of her time working on Paper Company accounting. (Morgan 67).

- Joan Meyers, a Packaging Company employee, provides minimal administrative services for the Paper Company, such as retrieving the mail from the Paper Company's P.O. Box in Maryland and sorting out the Companies' bills. (Morgan 31-32). Only a few percent of her time is spent on Paper Company business. (Morgan 67-68).

- Linda Reppenhagen occasionally coordinates with the Paper Company's General Manager to arrange delivery of orders for the Packaging Company which may be housed on a Paper Company trailer. (Morgan 69).

- Defendant has admitted from the beginning that certain Packaging Company

---

[5] Despite plaintiff's contentions that Ms. Grabowski has "taken the lead in representing the Paper Company in negotiations with the building contractor" (SB at 4), as Mr. Morgan clearly testified, Ms. Grabowski has spent "time keeping the notes of every meeting." (Morgan 45). Certainly, taking notes is not the equivalent of taking the lead in representing a company.

The Honorable Kent A. Jordan
February 3, 2006
Page 9

>employees provide accounting and administrative services to the Paper Company for $2,000 per month. As Mr. Morgan testified, the amount of services, absent the property issue and current litigation, has remained the same; only the allocation of the type of services has changed. (Morgan 49-51).

As can be seen from all Mr. Morgan's deposition testimony, not out of context references, these two Companies operate extensively, and sometimes painfully, at arm's length. Using Mr. Morgan's own words: "We try to be as accurate as we can....[T]hat is why the two [C]ompanies were organized the way they are.  They are separate." (Morgan 93).

Respectfully submitted,

/s/ Thomas S. Neuberger

Thomas S. Neuberger
Attorney for Defendant


cc:   Seth M. Beausang, Esq. (Via CM/ECF)
      M. Jean Clickner, Esq. (Via Email)
      Clerk of Court (Via Hand Delivery)
      client (Via Email)

PT Morgan \ Letters \ Jordan.03FINAL